**UNITED STATES of AMERICA,**
**Appellee,**

v.

**Charles LUCCHETTI, Appellant.**

**No. 417, Docket 75-1221.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 30, 1975.

Decided March 4, 1976.

Joan S. O'Brien, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (David G. Trager, U. S. Atty., Paul B. Bergman, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellee.

Henry J. Boitel, New York City, for appellant.

Before MULLIGAN, OAKES and MESKILL, Circuit Judges.

1. Dempsey's name is variously spelled "Dempsy" in parts of the record below. The briefs on appeal not offering any explanations for the different spellings and themselves using the former version, we shall assume that Dempsey is correct.

MESKILL, Circuit Judge:

Charles Lucchetti appeals from a judgment of conviction for conspiracy and armed bank robbery in violation of 18 U.S.C. §§ 371 and 2113(d) after a jury trial before Jack B. Weinstein, *District Judge,* in the United States District Court for the Eastern District of New York. Lucchetti previously had been tried and convicted on the same charges. That conviction, however, was vacated by Chief Judge Jacob Mishler upon Lucchetti's 28 U.S.C. § 2255 motion. Chief Judge Mishler concluded that the prosecution's failure to reveal that its chief witness had testified falsely about promises made in return for his testimony required that the initial judgment be vacated and Lucchetti retried. Lucchetti's major contention on this appeal is that certain admissions made by him while incarcerated after the first conviction and while his direct appeal was still pending should not have been admitted into evidence at the subsequent trial. He further contends that the district court committed plain error within the meaning of Fed.R.Crim.P. Rule 52(b) by failing to instruct the jury, as required by 18 U.S.C. § 3501, that it must consider the evidential weight of the confessions under all of the circumstances. We affirm the judgment of conviction.

Lucchetti has not attacked the sufficiency of the evidence against him, nor do we think that he can successfully do so. Consequently, the facts necessary for the resolution of the issues presented on this appeal relate more to the unusual conditions surrounding Lucchetti's admissions of guilt than to the underlying facts upon which he was convicted.

The appellant's first jury trial concluded with a verdict of guilt entered on August 5, 1971. The trials of his co-defendants, David Williams and Jack Dempsey,[1] had been severed immediately before Lucchetti's trial began on August 2, 1971. Williams and Dempsey both testified against Lucchetti, their testimony being the primary

evidence against him. On October 15, 1971, Chief Judge Mishler sentenced Lucchetti to a term of twenty years imprisonment and a $10,000 fine on the robbery count and a concurrent term of five years imprisonment and an additional fine of $5,000 on the conspiracy count. Lucchetti then appealed his conviction to this Court. Subsequent to Lucchetti's conviction, both of his co-defendants entered pleas of guilty to the conspiracy count; Williams was sentenced to a five year period of probation and Dempsey to a five year term of imprisonment.

Prior to Chief Judge Mishler's imposition of sentence, Lucchetti initiated what was to become a long series of letters to F.B.I. officials in order to secure interviews with agents. On September 1, 1971, Lucchetti was first interviewed by Agents Long and Achenbach at the Federal House of Detention. At the interview, an "Advice of Rights" form was read to Lucchetti, but he refused to sign it. It appears that the only matter discussed at this meeting was Lucchetti's surprise at having been convicted on the basis of Williams' and Dempsey's testimony.

The next communication from Lucchetti to the F.B.I. was a letter dated March 20, 1972. In that letter Lucchetti requested an interview to discuss alleged civil rights violations occurring at the Suffolk County Jail, where he had been transferred to await the disposition of state charges which were pending against him for his participation in an attempted bank robbery on May 13, 1971. The agents responded to the request by interviewing Lucchetti at the jail on March 27, 1972. Before any discussions of civil rights violations had begun, however, Lucchetti commented that his brother-in-law, Larry Russo, had received support from the F.B.I. in having a sentence reduced in exchange for cooperation. He then made a cryptic hypothetical reference to knowledge that he might have about several bank robberies which occurred after

his incarceration. Upon questioning about the robberies, however, he smiled but made no further comment. The agents took note of Lucchetti's civil rights complaints and, after the interview had ended, investigated the allegations, finding them to be without merit.

By letter dated May 31, 1972, Lucchetti requested another interview with Agent Achenbach; an interview was conducted at the jail on June 5, 1972. At the beginning of the interview, when Lucchetti began to volunteer information about bank robberies, Agent Long, who had accompanied Agent Achenbach to the jail, promptly advised Lucchetti of his full *Miranda* [2] rights. Lucchetti responded by specifically stating that he did not need an attorney, as he was representing himself. He also indicated that he understood all of his rights. When Agent Long reminded him that his appeal was still pending before this Court, Lucchetti again stated that he understood his rights and that he had discharged his trial attorney, Kenneth Rohl. He never mentioned that Henry Boitel was representing him on the appeal. Lucchetti then claimed that he had evidence that Dempsey, one of the chief witnesses against him, had lied at the trial when he had denied that the prosecution had promised him anything in return for his testimony. After revealing that the source of this evidence was Dempsey's wife who, according to Lucchetti, would say anything that he wanted her to say, he again stated that he had information that would be valuable to the government. Long stated that any such information would be given to Assistant United States Attorney Moore, the prosecutor in his case, and through him to the court.

On June 8, 1972, Lucchetti requested another interview with Agent Achenbach. On June 14, 1972,[3] Agents Long and Achenbach returned to interview Lucchetti at the Suffolk County Jail. Lucchetti was in-

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** It should be noted that on June 12, 1972, this Court affirmed Lucchetti's conviction without

opinion. The record on the present appeal does not make clear whether or not Lucchetti or the agents were aware of the affirmance at the time of the June 14, 1972 interview.

formed of his rights and was read the "Advice of Rights" form, which he again declined to sign. Although the purported reason for this interview was again to complain about deprivations of his civil rights at the jail, Lucchetti confided to the agents that the real purpose was for him to ascertain the possibility of receiving some reduction in his sentence in exchange for providing valuable information to the government. Agent Long indicated that he would make arrangements for Lucchetti to have an interview with an Assistant United States Attorney.

Before such an interview could be scheduled, Lucchetti sent another letter, dated June 20, 1972, requesting a further interview with Agent Achenbach. On June 26, 1972, Agent Long informed Lucchetti that an interview with Assistant United States Attorney Moore had been scheduled for July 17, 1972. Lucchetti complained that certain of his letters had not been mailed by the authorities at the jail; he also expressed his desire to cooperate with the government.

The next day, June 27, 1972, Lucchetti sent yet another letter requesting a meeting with the agents. In response to that letter Agents Long and Achenbach returned to the jail on July 17, 1972, the date originally scheduled for Lucchetti's interview with Moore. The agents informed Lucchetti that Moore could not see him on that day but would do so in the near future. Lucchetti again indicated in a "hypothetical fashion" that he possessed information about certain crimes, including robberies and a homicide, and criminal activities involving a prominent Suffolk County attorney and a Suffolk County police officer.

Four days later, on July 21, 1972, Lucchetti was interviewed by Moore and Agent Long. He repeated his "hypothetical" knowledge mentioned earlier and inquired of Moore what consideration he could expect to receive for revealing that information. Mr. Moore made no promises of leniency but told Lucchetti that he would inform Chief Judge Mishler and the United States Parole Board of any valuable cooperation by Lucchetti. Lucchetti indicated that he wanted to think over the matter and that if he decided to cooperate, he would contact the government by writing another letter alleging civil rights violations. Lucchetti told Agent Long that he was using the civil rights ruse as a means of concealing his cooperation with the federal authorities from people at the Suffolk County Jail.

On August 3, 1972, Agents Long and Achenbach returned to the jail in response to a letter written by Lucchetti shortly after the July 21 interview. Lucchetti informed the agents that he wanted to discuss four particular robberies, including the one for which he had previously been convicted. Because Agent Long was already aware, from prior investigations, that Lucchetti had been involved in the planning of all of these robberies, he not only gave Lucchetti four separate "Advice of Rights" forms (one for each separate robbery discussed) which Lucchetti signed, but also specifically reminded him that his petition for a writ of certiorari was pending in the United States Supreme Court. Lucchetti again said that he did not need counsel since he was representing himself and further indicated that he wanted to cooperate because he felt that his petition would be denied by the Supreme Court.

Detailing his own involvement in the four robberies, Lucchetti also implicated John Greenemeyer and Robert Chaffin, both of whom were deceased at the time of the interview, and Kenneth Rohl, his attorney in the first trial before Chief Judge Mishler. According to Lucchetti, Rohl took part in the robberies by "washing" or exchanging possibly marked bills for "clean" ones. Lucchetti was unsure of certain of the details of Rohl's "washing" operation, so the interview was broken off to be continued at a later date after Lucchetti had had a chance to "think it over."

On August 8, 1972, the agents returned to the jail to continue the interview. Lucchetti was again given the "Advice of Rights" form, but he indicated that such advice was not necessary since he considered this inter-

view to be merely a continuation of the one held on August 3, 1972. Nevertheless, Agent Long read the contents of the forms on four occasions during the interview and Lucchetti again replied that he both understood his rights and was representing himself. The substance of this interview centered on the four bank robberies.

Lucchetti was interviewed at the jail further on August 14, 1972, August 25, 1972, September 6, 1972 and September 10, 1972. On each occasion he was advised of his rights, and at all but one of the interviews, he executed written waivers of those rights. During these interviews Lucchetti discussed Attorney Rohl's misconduct at the first trial and his involvement in criminal activity, identified certain individuals from bank surveillance photographs, and advised the agents that Larry Russo had recently obtained a large amount of money, presumably as the result of his participation in a recent bank robbery. Lucchetti indicated that his wife, Barbara, was holding the money at her house. As a result of the last revelation Assistant United States Attorney Moore conducted a meeting in his office on September 12, 1972 with Agent Long, Lucchetti, his wife, and his sister-in-law, Elaine Switzer. After Moore had assured the women that he did not wish to prosecute them and that his primary intent was to recover the money, Lucchetti and the women discussed the matter privately. Later that day the women turned over $7,800 to the F.B.I. agents.

Subsequently, on September 27, 1972, October 2, 1972 and October 3, 1972 Lucchetti was interviewed further. He executed copies of the "Advice of Rights" form on the first two occasions. On those occasions the purpose of the interviews appears to have been to try to locate Russo and his alleged accomplice in recent robberies. On the October 3, 1972 visit, Agent Long informed Lucchetti that he had arranged an interview with a member of the Suffolk County District Attorney's Office as Lucchetti had requested. Lucchetti's meeting with Patrick Henry of that office took place on the

following day. At that meeting Lucchetti was again informed of his rights. He replied that he was representing himself and then revealed to Mr. Henry the same "hypothetical" information with which he had approached Moore earlier. Lucchetti requested consideration on the state charges pending in Suffolk County from the May 13, 1971 attempted bank robbery. Mr. Henry indicated that he would discuss the matter with his superior.

During the week of October 7, 1972, the F.B.I. received nine letters from inmates of the Suffolk County Jail, including Lucchetti, which letters alleged that there were "ten torture chambers" located in the jail. Lucchetti's letter also contained a request for an interview, to which Agents Long and Achenbach responded on October 12, 1972. Lucchetti informed the agents that he had dictated all of the letters in order to harass Suffolk County Jail officials.

On October 19, 1972, Lucchetti, after preliminary discussions with Agents Long and Lawrence Sweeney, met with Assistant United States Attorney Moore and expressed his willingness to testify that day before the Grand Jury. His one condition for testifying was that his appearance be kept secret since he feared that his life would be endangered if Rohl, in particular, discovered that he had been cooperating. Moore and Lucchetti then discussed several of Agent Long's reports of the previous interviews, and Moore indicated various questions he intended to ask Lucchetti before the Grand Jury. Lucchetti's testimony involved his participation in the bank robberies previously mentioned and included the allegations of Rohl's criminal activities. Reliable corroboration of the accusations against Rohl, which Lucchetti had previously promised he would give the Grand Jury, never materialized.

Several weeks later, in November 1972, Lucchetti entered a plea of guilty to a reduced state charge, stemming from the May 13, 1971 attempted bank robbery, in the District Court of Suffolk County.[4] He

4. The exact date upon which Lucchetti entered his guilty plea is not clear from the record. It should be noted, however, that the United

States Supreme Court denied his petition for a writ of certiorari on the federal conviction on November 6, 1972.

was sentenced to a term of one year to run concurrently with the twenty year federal sentence imposed earlier by Chief Judge Mishler.

Some three months later, on February 23, 1973, Lucchetti's appellate counsel, Henry Boitel, moved in the United States District Court for a reduction of sentence pursuant to Rule 35, Fed.R.Crim.P., and Chief Judge Mishler scheduled a hearing on the matter for March 2, 1973. At that hearing, Mr. Boitel argued that the sentence should be reduced for a number of reasons, none of which included Lucchetti's cooperation with the government. Assistant United States Attorney Moore, while not actively opposing a reduction, requested an adjournment until after Lawrence Russo could be apprehended. Moore apparently hoped that Russo's apprehension would verify some of the information given by Lucchetti. Chief Judge Mishler, however, advised both Moore and Mr. Boitel that he would not consider reducing Lucchetti's sentence even if he had been of assistance in locating Russo. Chief Judge Mishler stated that he "regard[ed] Mr. Lucchetti as one of the most dangerous criminals that ever appeared before" him.

Almost sixteen months later, on July 22, 1974, Lucchetti moved *pro se* pursuant to 28 U.S.C. § 2255 to vacate the judgment of conviction on his first trial. He alleged there for the first time that Jack Dempsey, the principal witness against him in the trial, had perjured himself when he denied that he had been offered any promises of leniency in exchange for his testimony. More importantly, Lucchetti further alleged that both Chief Judge Mishler and Assistant United States Attorney Moore had known that Dempsey's testimony was false yet did nothing to correct it. Chief Judge Mishler declined to disqualify himself and scheduled a hearing on the matter of Moore's participation in any perjured testimony. The court appointed John C. Corbett to represent Lucchetti at the hearing, but Lucchetti requested and was granted permission to proceed *pro se*. Mr. Corbett remained at counsel table throughout the proceeding. At the initial hearing, Dempsey testified that he had received no promises of leniency prior to Lucchetti's trial. Chief Judge Mishler thereupon dismissed Lucchetti's petition orally but indicated that a formal order would be entered subsequent to his writing findings of fact and conclusions of law. While he was preparing his memorandum of decision, however, Chief Judge Mishler discovered a letter in his file from an Assistant United States Attorney, dated September 5, 1974, to Mr. Corbett, directing Corbett's attention to a notation made by Dempsey's attorney, Simon Chrein, that "[Dempsey] will P.G. to Conspiracy. Sentence will be after Suffolk County Case and Long & Moore will put in a recommendation for light Sentence & Concurrency." Chief Judge Mishler immediately contacted Mr. Corbett who indicated that he had received the letter but that he had not informed Lucchetti of it or its contents.

The court reopened the hearing and heard testimony from Mr. Chrein, Assistant United States Attorney Moore and Agent Long. From that testimony Chief Judge Mishler found that Moore had told Mr. Chrein that if Dempsey testified at Lucchetti's trial the cooperation would be made known to the sentencing judge and that Moore would discuss with his superior the possibility of allowing Dempsey to plead guilty to the conspiracy charge alone. Chief Judge Mishler further found that prior to Lucchetti's trial, Moore had directly advised Dempsey that his cooperation would be made known to both the sentencing judge and the District Attorney of Suffolk County. However, the court also specifically found that Dempsey had not intentionally testified falsely at Lucchetti's trial when he denied that he was appearing in exchange for a promise of leniency. The court was convinced that Dempsey had not equated negotiations with a "promise" as he properly should have. Nevertheless, the

court found that, although Moore did not believe Dempsey's answers to be prejudicial, he "knew, or should have known, that Dempsey's answers to the questions . . . were false." Consequently, the Chief Judge vacated Lucchetti's conviction, relying primarily on the authority of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and directed that he be retried.

Prior to the retrial ordered by Chief Judge Mishler, Lucchetti moved to suppress the statements he had made to the agents and his testimony before the Grand Jury. He alleged by affidavit that Assistant United States Attorney Moore had promised that his Grand Jury testimony would never be used against him and had further advised him not to discuss the matter with his appellate attorney. Chief Judge Mishler conducted a hearing on the suppression motion.

At the hearing Lucchetti refused to testify on the ground that the court had denied his request to subpoena twenty-six witnesses who presumably would have testified about the inhumane conditions existing at the Suffolk County Jail.[5] Agent Long and Assistant United States Attorney Moore both testified that Lucchetti's statements came forth in the manner set forth earlier in this opinion. Lucchetti called Henry Boitel, Agent Achenbach and Elliot Wales, the attorney who had represented him at the initial stages of the case after the first conviction had been vacated.[6] Wales testified that on January 17, 1975, Moore had admitted having told Lucchetti on October 19, 1972 that he had no intention of using Lucchetti's impending Grand Jury appearance against him. Wales conceded on cross-examination, however, that he had not included this particular allegation of Moore's January 17 admission in the affidavit in support of the motion to suppress even

though he had been specific in other respects. Boitel testified that he had represented Lucchetti on his first appeal and on the motion to reduce his sentence, but that he had never discussed with Lucchetti his cooperation with the government. Agent Achenbach corroborated Agent Long's testimony but added that although Lucchetti had been hospitalized at the Suffolk County Jail as the result of a self-imposed hunger strike, he always appeared to be well oriented and never complained of any illness.

The government then recalled Assistant United States Attorney Moore who contradicted Wales' testimony with respect to the promise made to Lucchetti prior to the Grand Jury appearance. Moore admitted having told Wales in 1975 that he never "subjectively" intended to use the Grand Jury testimony in any further prosecution of Lucchetti, but he denied that this intent had ever been conveyed to Lucchetti. Moore testified that he had told Wales that the subject of further prosecutions had never arisen since Lucchetti's primary concern in giving that testimony had been a reduction of sentence.

On May 12, 1975, the district court filed an extensive memorandum decision and order denying Lucchetti's motion to suppress. Chief Judge Mishler found that Lucchetti had initiated all of the interviews in order to gain relief from his federal sentence, and that the statements had been made knowingly, intentionally and voluntarily, under no coercion of any kind. He further found that the only promises made to Lucchetti were that Assistant United States Attorney Moore had agreed to make Lucchetti's cooperation known to the sentencing court and to the United States Parole Board if the information he had promised to give were valuable, and that his cooperation would not be revealed to Kenneth Rohl. Chief Judge Mishler concluded that the government had not violated its obligations, pri-

---

5. The court did direct the issuance of subpoenas upon the psychiatrists at the Suffolk County Jail and upon the jail's records for trial.

6. Wales had been granted permission to withdraw as counsel and had been replaced by

Allan Lashley prior to the suppression hearing. During the hearing, Lucchetti also dismissed Lashley in order to proceed *pro se*. The court allowed Lucchetti to proceed *pro se* but directed Lashley to be present to assist him.

marily because Lucchetti's information was of insignificant value, but also because the government was relieved of its obligations as soon as Lucchetti's initial sentence had been vacated.

The retrial began before Chief Judge Mishler on May 12, 1975 but ended in a mistrial the next day. The court had forbid the government's eliciting any evidence with respect to Lucchetti's first conviction since, in the court's opinion, such evidence would be too prejudicial. In the course of reading Lucchetti's Grand Jury testimony into the trial record, however, the prosecutor inadvertently read a question which mentioned the word "conviction" in connection with the defendant. Chief Judge Mishler thereupon granted Lucchetti's motion for a mistrial.

The case was then reassigned to District Judge Jack B. Weinstein for a second retrial, which was scheduled for May 19, 1975. Lucchetti immediately moved to reopen the suppression hearing and was permitted to do so. On this occasion Lucchetti decided to testify. He asserted that he had been deprived of his civil rights while incarcerated at the Suffolk County Jail, implying that his statements to the agents had been psychologically coerced by the inhumane conditions at the jail. He further testified that both Moore and the agents had made various promises to him, and that his executions of the waivers on the "Advice of Rights" forms had been made at the urging of the agents. He then denied that Moore had ever explained or showed him the "waiver of immunity" form before he testified at the Grand Jury or that he had ever told the agents that his civil rights letters were pretexts or used for harassment purposes.

After testifying, Lucchetti again sought to subpoena witnesses to testify about the conditions at the jail and about his mental condition during his incarceration there. Judge Weinstein stated that such testimony would be unnecessary since he was fully aware of the conditions existing at the jail because of "extensive hearings" on those conditions which he had held in another case. He further concluded that any testimony with respect to Lucchetti's mental condition would merely duplicate the psychiatric reports already before the court. After hearing further testimony from Assistant United States Attorney Moore, Judge Weinstein orally reaffirmed the original denial of the motion, concluding that, "No promises were made to the defendant that the testimony he gave would not be used against him; He knowingly executed the waiver; He did not execute them because of any force, coercion, threats or brutality and at the Suffolk County jail there was no psychiatric basis for believing that he was not fully aware and voluntarily executed these documents. There simply is no basis for a motion to suppress here."

The trial began on May 20, 1975, and on May 22, 1975 the jury returned guilty verdicts on both counts. The only facts of interest to this appeal with respect to the trial are that the prosecution read portions of Lucchetti's Grand Jury testimony to the jury, that Agent Long testified about Lucchetti's admissions made at the Suffolk County Jail, and that Lucchetti himself did not testify or challenge in any manner the voluntariness of these "confessions."

*Discussion*

I.

Lucchetti has advanced four arguments to support his contention that his post-conviction admissions should have been suppressed at the trial. We find none of them persuasive and only one worthy of extended discussion.

His first position is that the psychological pressure of inhumane treatment at the Suffolk County Jail rendered his waiver of the right to remain silent an involuntary waiver. Implicit in his argument is the contention that both Chief Judge Mishler's and Judge Weinstein's findings of fact that the confessions were voluntarily and knowingly made were clearly erroneous. Those findings, however, are amply supported by the evidence adduced at two suppression hearings.

After full hearings Chief Judge Mishler found that "[t]he government proved beyond a reasonable doubt that the statements . . . and the testimony . . . were knowingly, intentionally and voluntarily [given]." To the extent that Chief Judge Mishler did not specifically address the physical and mental coercion question, *see United States ex rel. Lewis v. Henderson*, 520 F.2d 896 (2 Cir. 1975); *but see LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), Judge Weinstein corrected the deficiency by finding that Lucchetti did not waive his *Miranda* rights "because of any force, coercion, threats or brutality and at the Suffolk County jail there was no psychiatric basis for believing that he was not fully aware . . . . ." We see nothing in the record to convince us that those findings are clearly erroneous. The agents testified that Lucchetti was informed on numerous occasions of his right to remain silent, that he told them that the civil rights complaints were merely a pretext and that he appeared to be under no mental stress at any time. There was conflicting testimony, but the district court was perfectly justified in concluding that Lucchetti had voluntarily waived his right to remain silent and that he made his statements under no form of coercion.

Lucchetti next makes a two-fold argument that the statements were inadmissible because they were made after he had been led to believe that they would not be used against him, and further, that they were made as the result of other promises not fulfilled by the government. These arguments, however, are again foreclosed by adverse findings made by the district court which are supported by the record. Lucchetti argued below that the agents and Assistant United States Attorney Moore had promised not to use the statements against him, but the district court found that the only promises made to Lucchetti were that his cooperation, if valuable,

would be made known to the sentencing court and the United States Parole Board and that his cooperation would not be revealed to Kenneth Rohl.

In an attempt to circumvent these findings, Lucchetti now claims that he is justified in relaying on the "totality of circumstances" (i. e., that he was already serving a twenty year sentence and that the government was receptive to his bargain for cooperation), for the proposition that the government had made an implicit agreement not to use the statements against him. He has cited no authority, nor have we discovered any, to support such an argument. The district court's findings were made in full awareness of the fact that Agent Long specifically reminded Lucchetti that his appeal on the initial conviction was still pending before this Court and then later before the Supreme Court. Given those reminders, Lucchetti was on notice that the government would consider his statements fair game at a retrial should he succeed on his appeal. Furthermore, Lucchetti was specifically warned that his Grand Jury testimony could be used against him.[7] In short, we see no reason on this record to go behind the district court's finding that no such promise, either explicit or implicit, had been made.

Similarly, the district court's finding that the prosecution had fulfilled all of its explicit obligations to Lucchetti is supported by the evidence and not clearly erroneous. After having heard conflicting evidence from Lucchetti and the prosecution, the district court determined that the only promises made by the prosecution had been that if Lucchetti's information were valuable, his cooperation would be made known to the sentencing court and the United States Parole Board and further that his cooperation would not be revealed to Kenneth Rohl. Chief Judge Mishler also found, based primarily upon the testimony of

---

7. Prior to Lucchetti's testimony at the Grand Jury and after warning him that he was the subject of the Grand Jury's investigation, the prosecutor stated on the record:

"I wish to further advise you that you are a prospective defendant and that anything you might say before the grand jury could be used against you in a later proceeding or proceedings."

Agent Long and Assistant United States Attorney Moore, that Lucchetti's information with the exception of the return of the money by his wife, had been essentially uncorroborated and valueless, and concluded that Lucchetti was not in a position to invoke the agreement. *United States v. Nathan*, 476 F.2d 456, 459 (2 Cir. 1973), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56. Again, based upon an examination of the record before us, we see no reason to quarrel with those findings.

■ Lucchetti's last and most forceful argument is that the post-conviction admissions were "tainted" by the prosecution's initial and continuing illegal suppression of the fact that Dempsey had testified falsely at the first trial. More specifically, his argument is that the post-conviction admissions were the direct result of the first conviction which, in turn, resulted from the prosecution's illegal behavior at that trial. According to Lucchetti, his admissions "flowed directly" from the prosecutor's failure to correct the false testimony; had he not been convicted after the prosecutor's illegal behavior, he would not have been in the position which prompted the admissions. Given the facts of this case, his argument is unpersuasive.

Although not cited by Lucchetti, our analysis of his argument must begin with a restatement of principles enunciated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Quoting from Maguire, Evidence of Guilt, 221 (1959), the Supreme Court stated that:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'." 371 U.S. at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d at 455.

Our inquiry here is thus initially directed toward a determination as to whether or not the admissions "[have] been come at by exploitation of [the primary] illegality." In making such a determination it is necessary that we examine both the nature of that illegality and the degree of governmental culpability in it. *See United States v. Edmons,* 432 F.2d 577, 584–85 (2 Cir. 1970).

Here, of course, the illegality was Assistant United States Attorney Moore's failure to correct Dempsey's false testimony at Lucchetti's initial trial. The district court properly concluded that such a failure necessitated vacating Lucchetti's conviction. *Giglio v. United States, supra,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. It is clear, however, from the record below and from the district court's memorandum and order vacating the conviction, that although Moore "knew, or should have known" that Dempsey's testimony was false, he had no intention of nor was he aware he might be prejudicing the trial or securing an illegal conviction. Given what might properly be called Moore's inadvertence in failing to recognize the importance of Dempsey's mistaken testimony, it is difficult to accept Lucchetti's characterization of the taking, at his request, of the statements and the Grand Jury testimony, as an "exploitation" of the primary illegality.

Generally, the exclusionary rule has been applied in cases where the primary illegality is somehow connected with the evidence-gathering or investigative process. *See e. g. Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), (illegal search); *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), (illegal wiretap); *Wong Sun v. United States, supra,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (illegal arrest); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), (illegal line-up). It is within this context that this Court explained in *United States v. Edmons, supra,* 432 F.2d at 584 that, "[t]he Government 'exploits' an unlawful arrest when it obtains a conviction on the basis of the very evidence, not shown to have been otherwise procurable, which it hoped to ob-

tain by its unconstitutional act." It would seem rather far-fetched in the present case to suggest that the prosecution hoped, at the time of the first trial, to secure any inculpatory evidence as a result of Moore's inadvertence in the conduct of that trial. While there might be some conceivable situations where prosecutorial conduct at a trial has been so egregious that sanctions over and above the granting of a mistrial may be necessary, such is not the case here.

Assuming for the moment that Lucchetti's admissions were the "fruit of the poisonous tree" because they would not have been made had he not been incarcerated following conviction at the first trial, it nevertheless would seem that the purpose of the exclusionary rule cannot be served by the suppression of those admissions. It must be remembered that "the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561, 571 (1974).

In the case at bar, the district court found that the prosecutor had not acted in bad faith in his failure to reveal what he knew or should have known to have been false testimony. The prosecutor failed to correct the testimony primarily because he had misinterpreted his responsibility and further because he had not perceived the prejudice which may have resulted from that testimony, *i. e.,* the jury's possible unwillingness to credit Dempsey's testimony had it known that he had been negotiating for a plea. The prosecutor's error has been corrected by the grant to the appellant of a new trial. The threat of having an otherwise valid conviction overturned or a mistrial granted as the result of such inadvert-

ence is sufficient to deter such conduct in the future. Suppressing statements later voluntarily made by a defendant would be no greater deterrent to inadvertent prosecutorial errors than the realization that such errors will not be tolerated by the courts. Superimposing the suppression of voluntary admissions on top of the grant of a new trial would be judicial overkill not warranted by the facts of this case.

## II.

■ Lucchetti also contends that Judge Weinstein committed reversible error by neglecting to instruct the jury that it should give such weight to the confessions contained in Lucchetti's Grand Jury testimony and his statements to the agents as it felt such confessions deserved under all the circumstances. Lucchetti's contention is that once the issue of a confession's voluntariness had been raised to the court in his motion to suppress, 18 U.S.C. § 3501(a)[8] required that the jury be instructed that it may consider whether or not that confession was voluntary in considering what weight it should be given. He further asserts that such a failure is "plain error" cognizable on appeal even though he neither requested such a charge nor objected to the trial judge's failure to so charge. While we agree that the judge's failure to give specific instructions with respect to Lucchetti's confessions[9] was erroneous, we disagree with the contention that the error requires a reversal of the conviction in this case.

During the course of the trial, Lucchetti neither testified nor offered any evidence whatsoever from which the jury might infer that his confessions were anything but voluntary. His primary contention, demonstrated in both the evidence that he

---

**8.** 18 U.S.C. § 3501(a) provides:

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntari-

ly made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

**9.** 18 U.S.C. § 3501(e) defines the term "confession" as "any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing."

presented and in his summation to the jury, was that none of the testimony against him was believable. He further contended in summation that even his own testimony before the Grand Jury was not worthy of belief, but he never advanced any reason for such a contention.

Although in his jury charge Judge Weinstein did not refer specifically to the issue of voluntariness, he did on two occasions direct the jury's attention to the Grand Jury testimony and to Lucchetti's assertion that that testimony was "inaccurate" or "untrue," the result of governmental perjury or "other reasons that he related to you in connection with his summation." Again, in his general charge on credibility, Judge Weinstein referred to the weight to be given the Grand Jury testimony as follows:

"A difficult problem is for you to determine the credibility of the witnesses because the defendant's main contention here is that they were lying and that the Grand Jury testimony related to you was untrue.

"In weighing the testimony, the testimony given here or testimony that is given to you which was given at another trial or before the Grand Jury, you may consider the relationship of the witness to the Government or to the defendant, the witness' bias or interest in the outcome of the case, his manner while testifying, his or her candor as you observed it, or if you deduced it from the testimony that was read and [sic] the extent to which it has been corroborated or contradicted by other credible evidence."

The government contends that under the facts of this case, Judge Weinstein's charge was sufficient to satisfy 18 U.S.C. § 3501(a)'s requirements since the voluntariness of the confession had never been put in issue before the jury.

This Court recently reviewed the import of 18 U.S.C. § 3501(a) in *United States v. Barry*, 518 F.2d 342 (2 Cir. 1975). In *Barry, supra,* 518 F.2d at 348, the Court discussed

at length its recognition that a challenge to a coerced or involuntary confession raises issues relating to both the credibility of the confession and the unfairness of the government's proving a charge against an accused by coercing the evidence from him.[10] The Court concluded that a standard charge to the effect that it is the jury's duty to consider and weigh the evidence and to determine all of the facts, without specific reference to the confession and the voluntariness issue, was insufficient to comply with the statute's requirement that the jury shall "give such weight to the confession as the jury feels it deserves under all the circumstances." In that case the defendant had taken the stand and testified to the jury that federal agents had physically threatened him prior to his having made any statements. He had thus placed squarely before the jury the circumstances under which his statement had been given. The crux of the testimony was that his statements were not voluntary. Clearly, in such a case, as the Court in *Barry* concluded, the trial judge must allow the jury to "play a part in weighing the evidence of duress." *Id.* at 347. Without an instruction that it could, if it so wished, include the voluntariness of the confession in the process of determining the weight it should be given, the jury could well have imagined that "the confession was in fact and law voluntary" because it had been admitted into evidence. *Id.* at 348.

In the present case, the government offered evidence showing that the confession was voluntary. Lucchetti did not testify or offer evidence to the contrary. Included in that portion of the Grand Jury testimony read to the jury were the Assistant United States Attorney's questioning of Lucchetti with respect to his comprehension of his constitutional rights and Lucchetti's positive assertion that he was testifying before that body voluntarily. In addition, Agent Long testified extensively about informing Lucchetti of his rights and about Lucchet-

---

**10.** We feel no need to restate this Court's analysis of the statute's legislative history contained in *United States v. Barry, supra,* 518

F.2d 342, but simply refer the reader to that opinion.

ti's having signed the advice of rights form. Certainly, this testimony was elicited by the government to show that all of Lucchetti's self-incriminating statements had been freely and voluntarily given.

Because Lucchetti had raised the issue by a motion to suppress before trial and because there was evidence admitted at the trial which related to the voluntariness of the confessions; 18 U.S.C. § 3501(a) was applicable by its terms in the instant case. As this Court stated in *Barry,* "[i]t would be difficult to imagine a clearer imperative than the statutory direction that the judge '*shall* instruct the jury'." *Id.* at 346 (emphasis in original). Consequently, it was incumbent upon the trial judge to include in his charge instructions with respect to the voluntariness of a confession and that "the jury give such weight to the confession as the jury feels it deserves under all the circumstances." The court's failure to do so in this case was erroneous.

As the government has pointed out, however, Lucchetti offered no evidence at trial from which the jury could have inferred that the confessions were anything but voluntary. Conspicuously absent from the evidence at trial were any of the contentions raised by Lucchetti at the suppression hearing and discussed in Part I of this opinion. Even though the trial court failed to apply the statute, the appellant here certainly suffered "[in]sufficient prejudice," if any, "to justify vitiating the jury's verdict." *United States v. Birnbaum,* 373 F.2d 250, 257 (2 Cir. 1967), *cert. denied,* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99; *United States v. Barry, supra,* 518 F.2d at 348. The district court's error was indeed harmless.

### III.

Finally, Lucchetti contends that Chief Judge Mishler was biased against him and that such bias prejudiced the entire suppression hearing. We find this argument, together with the numerous other contentions advanced by Lucchetti, to be totally without merit. Not only did the Chief Judge grant Lucchetti a new trial when he discovered, by his own diligence, new evidence concerning the conduct of the original trial, he also proceeded in an eminently fair manner in granting a mistrial in the second trial. In any event, any possible bias which may have infected the Chief Judge by his having sat through Lucchetti's first trial and by his having been convinced of Lucchetti's criminal character, was surely dissipated by the transfer of the entire case to Judge Weinstein, who conducted a new suppression hearing before commencing the third trial.

For the reasons stated above, the judgment of conviction is affirmed.