**UNITED STATES of America, Appellee,**

v.

**Frank Joseph FUENTES and Carmello Sansone, a/k/a "Michel", Appellants.**

**Nos. 1397, 1402, Dockets 77–1083, 77–1179.**

United States Court of Appeals, Second Circuit.

Argued July 19, 1977.

Decided Sept. 14, 1977.

Michael Q. Carey, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., and Frederick T. Davis, Asst. U. S. Atty., New York City, of counsel), for appellee.

Phylis Skloot Bamberger, William J. Gallagher, The Legal Aid Society, New York City, for appellant Frank Joseph Fuentes.

Stuart R. Shaw, New York City, for appellant Carmello Sansone.

Before MESKILL and WATERMAN, Circuit Judges, and WARD, District Judge.*

ROBERT J. WARD, District Judge:

Frank Joseph Fuentes ("Fuentes") and Carmello Sansone, a/k/a "Michel" ("Sansone") appeal from judgments of conviction entered January 17, 1977, in the United States District Court for the Southern District of New York, after a seven-day jury trial before Judge Morris E. Lasker.

The indictment, in two counts, charged Fuentes and Sansone with violations of the federal narcotics laws.[1] The trial commenced on November 9, 1976. On November 22, 1976 the jury found Sansone guilty on Counts One and Two and Fuentes guilty on Count One.[2] Sansone was sentenced to concurrent terms of ten years imprisonment on each count, to be followed by a six-year special parole term. Fuentes was sentenced to seven years imprisonment, to be followed by a six-year special parole term.

In challenging their convictions, the appellants do not challenge the sufficiency of the evidence. Rather, they contend that the trial court erred: (1) in admitting into evidence certain tape recordings and transcripts of conversations between an informant and the appellants, without adequate authentication, in violation of their right of confrontation, and without sufficient proof of the informant's consent; (2) in failing to declare a mistrial when the government informant was not produced at trial; (3) in failing to charge the jury on the voluntariness of certain post-arrest statements made by appellant Fuentes; (4) in failing to order a second competency examination by a psychiatrist who spoke appellant Sansone's native languages. We find no error requiring reversal and therefore affirm.

## FACTS

The government's proof at trial consisted of the testimony of William Schnakenberg, an undercover agent of the Drug Enforcement Administration ("DEA"), and several surveillance agents. In addition, the government introduced into evidence a series of consent recordings made by a government informant known as "Hugo". Hugo himself did not testify, having disappeared approximately one month before the trial began.

On May 27, 1976, Hugo met Carmello Sansone and, in a recorded conversation, told Sansone that Schnakenberg wanted to purchase as much as ten kilograms of cocaine. In this conversation Hugo also told Sansone that Schnakenberg would first require a sample; if the sample was of acceptable quality, Schnakenberg would then purchase a half kilogram of cocaine. Sansone agreed to furnish Hugo with the sample but emphasized that he did not want to meet Schnakenberg. The conversation end-

---

* Of the Southern District of New York, sitting by designation.

1. Count One charged both defendants under 21 U.S.C. § 846 with conspiracy to violate the federal narcotics laws, the conspiracy running from May 1, 1976 until August 27, 1976. Count Two charged both defendants with distributing and possession with intent to distribute approximately one-half kilogram of cocaine on

June 4, 1976 in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2.

2. At the conclusion of the government's case, Fuentes moved pursuant to Rule 29, Fed.R. Crim.P., for a directed verdict of acquittal on Counts One and Two. His motion was denied with respect to Count One but was granted, without opposition by the government, with respect to Count Two.

ed with Hugo telling Sansone that he would determine whether Schnakenberg would authorize him to receive the cocaine. Later that day, Hugo met Sansone and Frank Joseph Fuentes and had an unrecorded conversation.

The sample requested on May 27 was delivered in the early evening of May 28, when Hugo met Sansone and Fuentes in midtown Manhattan and had another unrecorded conversation. DEA agents observing this meeting testified that Fuentes appeared to pass something to Hugo during the course of their conversation. Shortly thereafter, Hugo delivered a sample of cocaine to Schnakenberg who was waiting in a nearby bar. Schnakenberg immediately instructed Hugo to tell Sansone and Fuentes that he, Schnakenberg, had $20,000 in cash with him and that he was now prepared to purchase the half kilogram. Negotiations continued for two hours, ending in a deadlock due to Schnakenberg's insistence on conditioning the sale on his personally meeting Sansone to make the payment and receive the cocaine.

On June 1, 1976, Hugo again met with Sansone and Fuentes and had a recorded conversation. Hugo carried $20,000 to purchase the half kilogram of cocaine, but Sansone and Fuentes noticed the DEA surveillance team following them and aborted the delivery. However, before this occurred, Fuentes left the car in which they were riding to obtain the package of cocaine, entering an apartment building in upper Manhattan.

The attempts to consummate the sale of the half kilogram of cocaine continued on June 2, 1976. Hugo and Sansone drove around for several hours, continuously trying to determine whether they were being followed. Once again the delivery was aborted.

The repeated meetings between Sansone, Fuentes and Hugo apparently convinced Sansone that Hugo and Schnakenberg were the drug dealers they purported to be, for on June 3, 1976, Sansone allowed Hugo to introduce him to Schnakenberg. Schnakenberg and Sansone then had a lengthy recorded conversation, their first, at the end of which Sansone promised that the delivery of the half kilogram of cocaine would be made that day. However, once again, the delivery was not made.

Finally, on June 4, 1976, Schnakenberg and Hugo met Sansone and again agreed on the delivery of the half kilogram of cocaine. At Sansone's direction, Schnakenberg gave Hugo the $20,000 purchase money and Hugo and Sansone departed. About two hours later, Hugo returned and delivered the cocaine to Schnakenberg.

One week later, Schnakenberg and Sansone met and discussed the poor quality of the one-half kilogram delivered on June 4. To placate Schnakenberg, Sansone agreed to provide him with a free "make-up" package of cocaine. With that matter settled Sansone announced he had more cocaine to sell at $40,000 per kilogram. They then discussed the possibility of a future sale of five kilograms.

On June 15 and 16, 1976, Sansone and Schnakenberg discussed the promised delivery of the make-up package and other possible future narcotics transactions.

The negotiations between Sansone and Schnakenberg came to a close on June 17 and 18. On the 17th, Schnakenberg agreed to meet Sansone the following day to receive a sample of the new cocaine Sansone had obtained. Sansone delivered a small sample of cocaine to Schnakenberg on the 18th after entering an upper Manhattan apartment building, the same building which Fuentes had entered on June 1, 1976 during one of the initial attempts to deliver the half kilogram of cocaine. Later that day, when Schnakenberg told Sansone that he was displeased with the quality of the new cocaine and that he would purchase no more, Sansone tried to reassure Schnakenberg of its purity by stating that he himself had taken the sample from a three kilogram package. Fuentes and Sansone were arrested on August 18, 1976.

## DISCUSSION

### I. *The Admissibility of the Tape Recordings*

Both appellants advance various arguments concerning the admissibility of the four tape recordings admitted into evidence at their trial. We find none of appellants' points persuasive.

At trial, the government laid the following foundation for admitting the tape recordings into evidence. On May 27, 1976, DEA agents fitted the informant Hugo with a concealed Nagra tape recorder. Hugo subsequently met with appellant Sansone under the close surveillance of several DEA agents. After this meeting was completed, the agents removed the recorder and tape from Hugo's body, placed the tape in a heat-sealed evidence envelope, and initialed and dated the envelope. On June 1, 1976, DEA personnel installed both a Nagra recorder and a Kel transmitter in an undercover vehicle for Hugo's use in future negotiations with the appellants. Hugo again met with Sansone and with agent Schnakenberg; once again, the entire meeting was conducted under the surveillance of DEA agents. When this meeting was completed these tapes were also placed in heat-sealed evidence envelopes, initialed and dated by DEA agents. In addition, a Kel receiver, tuned to the transmitter placed in Hugo's car, was located in a nearby vehicle and monitored by a member of the DEA surveillance team. On June 2 and 3, 1976, the same procedures for making and preserving the recordings as were employed on June 1 were repeated.

These tapes, which provided a detailed account of the narcotics negotiations between the informant Hugo, the appellants, and agent Schnakenberg, were all admitted into evidence over defense objections based on their inability to confront Hugo and the government's insufficient demonstration of Hugo's consent.

Fuentes now contends as his first point on this appeal that there was an insufficient showing of authenticity and general accuracy of the tape recordings and that the tapes should therefore have been excluded. Relying upon *United States v. McKeever*, 169 F.Supp. 426 (S.D.N.Y.1958), *rev'd on other grounds*, 271 F.2d 669 (2d Cir. 1959),[3] appellant urges that because the informant Hugo did not testify at trial the government failed to lay the requisite foundation for the admission of the tape recordings.

The first reason for rejecting this argument is that Fuentes did not object to the adequacy of the government's foundation for admission of the tapes at the time they were introduced, although he had full opportunity to do so. This failure to make timely objection when any inadequacy might have been rectified by the prosecution or resolved by the trial judge's ruling precludes raising the claim at this time. As we recently reiterated "where a party has shifted his position on appeal and advances arguments available but not pressed below . . . ., and where that party has had ample opportunity to make the point in the trial court in a timely manner, . . . waiver will bar raising the issue on appeal." *United States v. Braunig*, 553 F.2d 777, at 780 (2d Cir. 1977) *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977) (citations omitted). *See also United States v. Chiarizio*, 525 F.2d 289, 293 (2d Cir. 1975).

---

**3.** Specifically, appellant asserts that the following statement posits the relevant "test" for determining whether an adequate foundation for the admissibility of tape recordings has been presented:

[B]efore a sound recording is admitted into evidence, a foundation must be established by showing the following facts:
(1) That the recording device was capable of taking the conversation now offered in evidence.
(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.
(4) That changes, additions or deletions have not been made in the recording.
(5) That the recording has been preserved in a manner that is shown to the court.
(6) That the speakers are identified.
(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*United States v. McKeever, supra*, 169 F.Supp. at 430.

Secondly, even if Fuentes had interposed timely objections to the failure to call Hugo to testify as to the accuracy and reliability of the tapes, they were fully admissible.

Contrary to Fuentes' assertion, this Circuit has never expressly adopted a rigid standard for determining the admissibility of tape recordings. In *McKeever, supra,* 271 F.2d at 675–76, we cited with approval Judge Herlands' approach to the admissibility of the tape recordings on those facts, and we continue to regard the "elements" listed in Judge Herlands' opinion as a valuable formulation of the factors a trial judge should consider in making an initial determination whether a sufficient foundation for the admissibility of the tape recordings has been established. However, the varying circumstances of particular cases in which one or another aspect of this problem may present itself militate against our adoption of inflexible criteria applicable to all cases.

■ On the other hand, since recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration, we have adopted a general standard, namely, that the government "produce clear and convincing evidence of authenticity and accuracy" as a foundation for the admission of such recordings. *United States v. Knohl,* 379 F.2d 427, 440 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). In the case at bar, the government satisfied this burden.

■ At trial, the prosecution adduced competent and uncontroverted proof that the recording devices were capable of recording the appellants' conversations, that the agents carefully placed the devices on the informant or in his vehicle, that the agents were able to observe most, if not all, of the incriminating conversations and identify each participant, and that the agents immediately removed and sealed the tapes after each meeting. Clearly this testimony sufficiently establishes the authenticity and accuracy of the tapes. There simply is no requirement that the tapes be put in evidence through the person wearing the recorder or, for that matter, through a contemporaneous witness to the recorded conversations. *See United States v. Bonanno,* 487 F.2d 654, 659 (2d Cir. 1973); *United States v. Sansone,* 231 F.2d 887, 890–91 (2d Cir. 1956).

■ We similarly find Fuentes' additional and related argument that the tapes were inadmissible because Hugo may have tampered with the recording devices unpersuasive. Aside from being completely speculative, it is hard to believe that Hugo could have effectively changed the character of a running conversation, by turning the device on and off, without such attempts being immediately obvious to those present as well as to anyone listening to the tapes. In addition, because the informant would have run a substantial risk of personal harm if he had been observed reaching into his clothing, manipulating the armrest in his car, or creating a "click" during the appellants' incriminating conversations, it is highly unlikely that he would have made such efforts at tampering. Moreover, the June 1 tape, which most directly concerns Fuentes and is most damaging to him because it is the only one which contains his voice, was recorded by a Kel device which transmits conversations to a remote receiver where it is monitored and taped. Since the actual recording was made by a DEA agent, any argument about Hugo's tampering or selective editing of this tape must be dismissed as specious. Lastly, had Fuentes so desired he could have called an expert to examine the tapes for evidence of tampering. What arguments Fuentes now raises go only to the weight to be given to the tapes, not to their admissibility.

■ Similarly, without merit is Fuentes' separate claim that his right of confrontation was violated by the admission into evidence of a portion of the transcript of the June 1 tape recording in which Hugo addressed the DEA surveillance agents after both defendants had left Hugo's presence. In that portion of the transcript Hugo summarized the events in which he had just participated. An examination of the record reveals that this particular piece of evi-

dence was introduced not at the request of the government but at the request of appellant Sansone. The government objected to the relevance of this evidence and specifically requested a limiting instruction that Hugo's statements on this part of the recording were not to be taken for their truth. Appellant Fuentes not only failed to raise any contemporaneous objection but, indeed, expressly asserted that he had no objection to the admission of this transcript. Clearly, then, he can hardly complain on appeal. *United States v. Braunig, supra* at 780–81. Any other rule would permit the defendants in a multi-defendant trial to seed the record with error at trial and reap the benefits on appeal. In any event, we are unable to discern how the non-incriminating summary remarks of the informant on this portion of transcript, even if taken for their truth, aided the government's case or prejudiced appellant Fuentes' defense.

■ Appellant Sansone makes the argument that it was error to admit the tape recordings inasmuch as there was an insufficient showing of the informant Hugo's consent.[4] After *United States v. Bonanno,* 487 F.2d 654, 658–59 (2d Cir. 1973), we can find no merit in this argument. In *Bonanno,* where this Court was presented with an identical claim on similar facts, we noted that "[i]t will normally suffice [to prove consent] for the government to show that the informer went ahead with a [conversation] after knowing what the law enforcement officers were about." We further held in *Bonanno,* that this showing, which is considerably less stringent than that required to show consent for a physical search, may consist of circumstantial evidence, rather than direct evidence from the informant or from agents to whom the informant gave his express consent.

In the case at bar, the government demonstrated, at a mid-trial hearing conducted by Judge Lasker on this issue, that the informant at some personal discomfort and

substantial risk, allowed himself to be fitted with a recording device. The inescapable inference from this showing is that the informant proceeded, knowing his conversations were being recorded, and therefore gave his consent. In short, the government demonstrated far more than that the informant "went ahead with a [conversation] after knowing what the law enforcement officers were about." Thus, our decision in *United States v. Bonanno, supra,* is dispositive here; Judge Lasker's conclusion that the recordings were consensual was well-founded.

Accordingly, we must reject all of the appellants' challenges to the admissibility of the tape recordings.

## II. *The Absence of the Informant at Trial*

■ In the course of a pre-trial conference, Judge Lasker, exercising the discretion conferred by *United States v. Cannone,* 528 F.2d 296 (2d Cir. 1975), ordered the government to provide the defense with a list of its witnesses. On November 5, 1976, four days prior to the beginning of trial, the government forwarded to defense counsel a list of thirty-one "potential" government witnesses including the name of the informant. Neither appellant made any attempt to locate or interview the informant or any other potential government witness. During the trial, the government disclosed that the informant would not be called as a government witness since he had apparently disappeared. Judge Lasker offered to conduct a hearing on the issue of the informant's availability and the extent of the government's efforts to locate him. Aside from some preliminary questions, addressed to the prosecution outside the presence of the jury, neither appellant pressed for an examination of the government's attempts to find Hugo or requested that a hearing on his whereabouts be held. Nor did either appellant seek a continuance for the purpose of locating Hugo or request that the government assist the defense in conduct-

---

4. Appellant apparently concedes, as he must, that a defendant's fourth amendment rights are not violated when the defendant's conversations with a government informant are electronically monitored by a government agent with the consent of the wired informant. *See United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality opinion).

ing a search. Instead, trial counsel for each appellant merely objected in general terms to the prosecution's failure to call Hugo and commented at length on his absence in their summations.

Sansone now claims, in a somewhat diffuse fashion, that the government's proof at trial, when coupled with the absence of the informant, deprived him of his right to confrontation. Analogizing from *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), he contends that the failure to produce Hugo at trial constituted error requiring a new trial, dismissal of the indictment or, at the very least, a remand for a hearing on the issue of Hugo's availability.

The claim is without substance. Appellant's citation of *Roviaro* lends no support to his present argument. The Supreme Court in *Roviaro* was concerned with the problem which arises when the government asserts a privilege as to the very identity of an informant and the informant is, in a real sense, "unknown" to the defendant. Accordingly, the rule established in *Roviaro*, requires no more than that the identity of an informant be disclosed when it "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60–61, 77 S.Ct. at 628. To the extent that appellant seeks to extrapolate from *Roviaro* that the government has a duty to produce the informant at trial or to guarantee his availability, his contention is refuted by a long line of cases in this Circuit. *See, e. g., United States v. Super*, 492 F.2d 319 (2d Cir. 1974); *United States v. Ortega*, 471 F.2d 1350 (2d Cir. 1972); *United States v. Cimino*, 321 F.2d 509 (2d Cir. 1963), *cert. denied*, 375 U.S. 974, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964). *See also United States v. D'Angiolillo*, 340 F.2d 453, 455 (2d Cir.), *cert. denied*, 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965), and the cases cited therein.

■ Sansone's somewhat incredible assertion that he was unfairly surprised by the prosecution's failure to call Hugo and that he had relied to his detriment upon the prosecution's potential witness list does not change matters substantially. The purpose of witness lists is to permit the defense to interview potential witnesses and seek information about them in preparation for trial. *United States v. Cannone, supra*, 528 F.2d at 301. The inclusion of a name upon such a list does not require the government to call all such witnesses and any defense reliance thereon for that purpose is unjustified. Furthermore, this Court is of the view that had the appellant any real interest in obtaining the informant Hugo's testimony he would, at the very least, have made some attempt to locate or interview him. In light of appellant's utter failure to undertake any such effort, appellant's present claim of surprise and detrimental reliance is not only unjustified, it is frivolous.

Appellant Sansone fares no better with his additional claim that since the informant would have been the linchpin to his defense of entrapment, his conviction should be reversed because of the prosecution's failure to call Hugo. There is simply no substantiation in the record for the assertion that Hugo was crucial to the appellant's entrapment defense. With respect to this contention as well as the other arguments addressed to the absence of the informant at trial, we are compelled to agree with the government's argument that the appellant has attempted "to create a legal windfall from an event that actually benefited him at trial." As we said in *United States v. Comulada*, 340 F.2d 449, 453 (2d Cir.), *cert. denied*, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965):

> We note that in case after case, in appeals from convictions for trafficking in narcotics, we hear arguments regarding the government's failure to call the informer or special employee. . . . It seems to be defense strategy to bring out facts from which it can be argued that the government or the court should have called the informer as a witness. Almost never is there a genuine effort to find the witness or to call him even when it is certain that he is available and subject to process . . . We think that this is another such case. (citations omitted).

### III. The Court's Failure to Charge on the Voluntariness of Fuentes' Confession

Following his arrest, Fuentes stated that he recognized two of the arresting agents "from the street," that he had noticed them following him during the negotiations in May or June, that sometime prior to his arrest he went to the rooftop of a building near the New York City headquarters of the DEA to observe agents and their vehicles through binoculars to keep aware of what was going on in his business, and that although he had noticed agents following him, he went through with the present deal because he had to take a chance. He now contends that the voluntariness of this "confession" was raised at trial and that Judge Lasker was therefore required, under 18 U.S.C. § 3501[5] to instruct the jury on this issue. Because Fuentes neither requested such a charge nor objected to the failure to so charge he is compelled to assert further that the failure to charge was "plain error," see *United States v. Barry*, 518 F.2d 342 (2d Cir. 1975), requiring reversal. We find no merit to this claim for two reasons.

■ First, an instruction of the kind required by 18 U.S.C. § 3501 is mandated only where an issue of voluntariness has in fact been raised at trial. *United States v. Diop*, 546 F.2d 484, 486 (2d Cir. 1976); *United States v. Lucchetti*, 533 F.2d 28, 39 (2d Cir. 1976); *United States v. Barry, supra*, 518 F.2d at 346. The only evidence that Fuentes is able to muster in support of his claim that voluntariness in fact was raised is that during the cross-examination of one of the DEA agents who was present at the appellant's arrest, the agent admitted that Fuentes had at first stated that he did not wish to cooperate or make a statement but that the agent continued nonetheless to talk to Fuentes, finally eliciting the incriminating statements. We do not regard this single piece of evidence as sufficient to raise an issue of voluntariness and thereby invoke § 3501.

This conclusion is buttressed by Fuentes' trial tactics. At trial, Fuentes' counsel made no mention of the issue of voluntariness in his opening remarks to the jury and subsequently waived cross-examination of the other two DEA agents who testified to Fuentes' post-arrest statements. In this respect the instant case is readily distinguishable from *United States v. Barry, supra*, where the defendant squarely placed the issue before the jury by consistently "claim[ing] that the statements had been extracted by means of verbal threats and physical intimidation." *Id.* at 345. Moreover, unlike Barry, Fuentes did not testify before the jury to his version of the interrogation. Finally, and significantly, Fuentes' counsel argued in summation not that the statements were coerced or involuntary, but that they had never been made and that the jury should reject the testimony of the government's witness as incredible and fabricated. Thus, it appears that Fuentes deliberately avoided the issue of voluntariness in his summation and throughout the trial so as not to undercut his position that the admissions had in fact not been made. *See United States v. Diop, supra*, 546 F.2d at 486. Accordingly, this Court concludes that the minor allusion during cross-examination to possible overbearing conduct of one of the agents was insufficient to raise an issue of voluntariness.[6]

---

**5.** 18 U.S.C. § 3501 provides in pertinent part:

(a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

\*   \*   \*   \*   \*   \*

(e) As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

**6.** In addition to this purported issue as to voluntariness of the statements, there was an allusion at trial as to whether Fuentes understood his *Miranda* rights. In the course of a hearing

■ Second, even if the issue of voluntariness had been raised, Judge Lasker's failure to give a charge under § 3501 was not "plain error," but was, at most, harmless error. *See United States v. Lucchetti, supra,* 533 F.2d at 40. In *Barry, supra,* aside from the defendant's admissions, the only evidence of his participation in the narcotics transactions was inconclusive testimony of surveillance agents and the testimony of another individual who was awaiting sentence on drug charges. By contrast, in the instant case the government adduced considerable proof of Fuentes' guilt, wholly independent of his post-arrest statements.[7] In light of the considerable evidence placing Fuentes in a central role in the narcotics transactions, we hold that the failure to charge with respect to such a minor part of the government's case did not constitute "plain error" requiring the setting aside of the jury's verdict. *United States v. Lucchetti, supra,* 533 F.2d at 40; *United States v. Barry, supra,* 518 F.2d at 348.

## IV. *Refusal to Order a Second Competency Examination*

■ As his final point of appeal, appellant Sansone argues that his constitutional rights to due process and equal protection were violated when a post-trial competency examination was performed by a psychiatrist who was not "qualified," see 18 U.S.C. § 4244, since the psychiatrist spoke neither Italian nor French, Sansone's first two languages.[8]

The record discloses that Judge Lasker ordered a competency examination shortly after receiving defense counsel's post-trial notice that there was a question whether Sansone had been competent to stand trial. Before the court-appointed psychiatrist had reported the results of his examination, Sansone's counsel made a second motion, on December 16, 1976, formally requesting the appointment of a French- or Italian-speaking psychiatrist. In support of this second motion, Sansone's counsel pointed out that the services of an interpreter had been necessary during trial and counsel had experienced difficulty communicating with Sansone.

On December 24, 1976, the court-appointed psychiatrist reported the results of his examination. He found that Sansone had been competent to stand trial inasmuch as his memory concerning recent and remote events appeared to be unimpaired. In addition, the psychiatrist "strongly suspect[ed] that there may be volitional components through which Mr. Sansone attempts to make himself less understood than is necessary," and concluded that Sansone had an adequate knowledge and appreciation of the charges against him and was able to assist counsel in his own defense. At the sentencing, Judge Lasker formally denied Sansone's second motion on the ground that he found no basis for conducting another examination.

In essence, Sansone asserts that Judge Lasker abused his discretion in finding that

held outside the presence of the jury, Fuentes testified that he did not understand that he was being apprised of his rights when he was arrested. This assertion was not raised on appeal, and in any event, is also insufficient to invoke the provisions of 18 U.S.C. § 3501. *See United States v. Diop, supra,* 546 F.2d at 486.

**7.** As noted above, the prosecution's proof at trial consisted of the testimony of agent Schnakenberg, an actual participant in the transactions, testimony of the surveillance agents, and the tape recordings of the actual negotiations.

**8.** 18 U.S.C. § 4244 provides in pertinent part:
Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States

Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court.

Sansone was able to communicate effectively in English with the court-appointed psychiatrist. We find no abuse of discretion.

At the time of his ruling Judge Lasker had ample evidence demonstrating Sansone's ability to communicate effectively in English. During the trial the court heard a lengthy tape recording in which Sansone conversed in English and the court heard testimony that Sansone had had numerous conversations in English with agent Schnakenberg in which the two of them discussed detailed narcotics transactions. Judge Lasker also had before him the competency report which indicated that the psychiatrist had conducted an extensive interview of Sansone in English, from which the doctor was able to draw his professional conclusions. In light of these circumstances, we can only conclude that Judge Lasker acted well within his discretion in refusing to order a second examination.

Judgments affirmed.