UNITED STATES of America,
Appellee,

v.

Michael HAMILTON and Nicola Messere, also known as Supercop,
Defendants–Appellants.

Docket Nos. 02–1315(L), 02–1322.

United States Court of Appeals,
Second Circuit.

Argued: May 20, 2003.

Decided: July 2, 2003.

Elizabeth S. Riker, Assistant United States Attorney, Syracuse, New York (Glenn T. Suddaby, United States Attorney for the Northern District of New York, Gregory A. West, John Katko, Assistant United States Attorneys, Syracuse, New York, on the brief), for Appellee.

Joseph Tacopina, New York, New York (Joseph A. Bondy, New York, New York, on the brief), for Defendant–Appellant Hamilton.

Paul DerOhannesian II, Albany, New York (DerOhannesian & DerOhannesian, Albany, New York, Joseph A. Bondy, New York, New York, on the brief), for Defendant–Appellant Messere.

Before: KEARSE, STRAUB, and RAGGI, Circuit Judges.

KEARSE, Circuit Judge.

Defendants Michael Hamilton and Nicola Messere, former officers in the Schenectady, New York Police Department, appeal from judgments entered in the United States District Court for the Northern District of New York following a jury trial before David N. Hurd, *Judge*, convicting them of narcotics-related offenses. Hamilton was convicted on one count of aiding and abetting the maintenance of a residence for the purposes of distributing and using controlled substances, in violation of 21 U.S.C. §§ 856(a)(1) and (b) and 18 U.S.C. § 2, and one count of using a cellular telephone to facilitate such maintenance, in violation of 21 U.S.C. §§ 843(b) and (d)(1); he was sentenced principally to 54 months' imprisonment, to be followed by a three-year term of supervised release. Messere was convicted on one count of distributing and possessing with intent to distribute cocaine base (crack), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); he was sentenced principally to 27 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, defendants contend primarily that the evidence was insufficient to support their convictions. Alternatively, they contend that the district court should have granted them a new trial on various grounds, including prejudicial spillover of evidence introduced in support of a count on which they were acquitted, alleged errors in the admission of evidence, and the government's alleged subornation of perjury and nondisclosure of exculpatory evidence. Hamilton also challenges his sentence. Finding no merit in any of defendants' contentions, we affirm.

## I. BACKGROUND

The present prosecution arose out of a 1999 federal investigation of several Schenectady Police Department ("SPD") officers who were suspected of providing crack cocaine dealers and addicts with drugs, immunity, and protection in exchange for information about other drug dealers. Hamilton and Messere were named in a five-count superseding indictment (the "indictment") that charged both defendants with racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Count One); charged Messere with distributing and possessing with intent to distribute crack on or about July 19, 1998, in violation of 21 U.S.C. § 841(a)(1) (Count Two); and charged that Hamilton, on or about March 8, 2000, aided and abetted the maintenance of a residence for purposes of using and distributing crack, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Count Three), attempted to intimidate a witness with intent to obstruct a United States Drug Enforcement Administration ("DEA") investigation, in violation of 18 U.S.C. § 1512(b)(3) (Count Four), and used a cellular telephone to facilitate maintenance of a crack house, in violation of 21 U.S.C. § 843(b) (Count Five).

The jury ultimately returned verdicts of guilty only on Counts Two, Three, and Five. The government's principal trial witnesses with respect to those counts included SPD Officer Thomas Gabriele; former SPD Officer Michael Siler; and Darla Wharry, a crack user who had pleaded guilty to operating a crack house. The government also introduced a tape record-

ing of certain conversations to which Wharry was a party and records of telephone calls made to Wharry's residence from Hamilton's cell phone. Taken in the light most favorable to the government, the evidence pertinent to the counts on which defendants were convicted showed the following.

## A. *Messere's Distribution of Crack on July 19, 1998*

The government's principal witness on the charge that Messere had distributed and possessed crack with intent to distribute was Siler. Siler was an SPD officer who had been suspended in 1999 as a result of the federal investigation and had been dismissed in 2001 after he pleaded guilty to violating RICO by conducting the affairs of SPD through a pattern of racketeering activity. That activity included identifying drug dealers who had narcotics in their possession, taking the narcotics without arresting the dealers, and giving the drugs to various informants rather than reporting or delivering the contraband to SPD.

During his tenure in SPD, Siler had participated in seizures of substances that he believed to be crack cocaine, and laboratory tests had proved him correct. Based on that experience, Siler was able to recognize crack by its appearance. He was also familiar with the manner in which crack was packaged for sale to users.

Siler testified that at noon on July 19, 1998, he began a four-hour patrol shift, partnered with Messere. During that shift, at the intersection of State Street and Swan Street, Siler and Messere saw one of Messere's informants, Tina Martinez, who was a prostitute and crack addict. Siler testified that Messere motioned Martinez toward the car and said something Siler could not hear. When Martinez walked toward the car, Messere

"threw some bumps out the window, some pieces of crack cocaine that he had and drove off." (Trial Transcript ("Tr.") 3325.) "[B]umps" were "small pieces of an off-white rock-type substance [that] appeared to be crack cocaine," packaged "in small baggie corners, tied off," in the manner in which, in Siler's experience, crack was sold. (*Id.*)

The government also called Martinez as a witness. She testified in part as follows:

Q. Do you recall sitting on State Street one day and seeing Officer Messere?

A. It was in the summertime.... I was sitting on the steps and Nick came up on the sidewalk in the police car. He came out of nowheres, and he would drive up and ask me who got it good. You know, where is the good crack at, and I told him I don't know. I don't know, you know, and he threw me a bump and told me to get off the streets, and he just drove away ....

. . . .

Q. You say he threw something out the window, would you describe what he threw out the window?

A. A bump. A bag of crack, you know.

Q. What did you do with this bag of the substance then?

A. I picked it up and went home and smoked and came right back out.

. . . .

Q. Had you ever smoked crack cocaine before that?

A. Yes.

Q. And you smoked this substance that he threw out the window?

A. Yes, I smoked it.

Q. What was it?

A. Rock. That is what we call it. It was crack, it was drugs, my god it was drugs. We got high. It was drugs.

(Tr. 3022–24.)

Martinez could not recall in what year this incident had occurred. Before the grand jury, she had testified that it occurred in 1996 or 1997; at trial she could not even recall that testimony.

### B. *Hamilton's Assistance to Wharry in Maintaining a Crack House*

The government's evidence to support Counts Three and Five against Hamilton was provided principally by Wharry and Gabriele. Wharry was one of Messere's informants who both sold and used crack. In March 2000, she lived in an apartment at 1213 First Avenue with Roger Little (aka "Hodgy") and allowed others to use and sell crack there.

Wharry testified that Hamilton was well aware of her use of her residence as a crack house, in part because she would call Hamilton and inform him that drug dealers were there. She described one occasion on which she had called Hamilton to her prior residence on Eighth Avenue to tell him drug dealers were there. On that occasion, Hamilton responded that he was coming and instructed her to make sure the dealers did not flush anything down the toilet. When Hamilton arrived, he arrested the drug dealers. When he left, he told Wharry there were "cigarettes" upstairs (Tr. 986); Wharry then found crack cocaine upstairs in a cigarette box. This was consistent with her previous experiences with Hamilton. And she thereafter continued to provide Hamilton with information and to call him when drug dealers were in her home; Hamilton continued to come and take the dealers away; and he always left crack behind for Wharry. (*See* Tr. 984–88.)

In late 1999, Wharry moved her residence, and her operation of a crack house, from Eighth Avenue to 1213 First Avenue. Her relationship with Hamilton continued:

Q. Did Mike Hamilton know that there was a crack house being operated at 1213 First Avenue during the time that you lived there?

A. Yes.

Q. How did he know that?

A. It was obvious. There was so many drugs coming in and out of my house. I would always call him when the drug dealers were coming up there, and he would come up and bust them.

Q. Had he ever been in there and seen drugs without arresting people?

A. Yes.

(Tr. 999.) Wharry testified that she "receive[d] ... protection from Mike Hamilton as [she was] running this crack house" (Tr. 1000); that she was able to find out about police activity and police raids from Siler and Hamilton (Tr. 995); and that she "never got arrested" (Tr. 999).

The government also called as a witness Antoinette Zwicker who testified that from the fall of 1999 and into 2000, she went to 1213 First Avenue to use drugs "pretty much every day." (Tr. 867.) Zwicker testified that she went there

[b]ecause that was where I felt the most—I felt safest there. I felt like nothing was going to happen to me while I was using drugs there.

. . . .

Q. Why would you feel safe?

A. I figured that nothing would happen if Darla was an informant for Hamilton.

Q. Why did you think that?

A. Because that is what she told me. I remember her calling him all the time, always calling him if she had any problems, if she wanted people out of the

house or just for whatever, pretty much if she wanted people out of the house, and I just felt safe there because I figured nothing would happen.

(Tr. 867–68.)

The events of March 8, 2000, were described by Wharry, Zwicker, SPD Officer Gabriele, who was then working with a task force of DEA agents and SPD vice squad officers (the "Task Force"), and members of the Task Force. Gabriele testified that on March 8, the Task Force planned to have a confidential informant make a controlled buy of narcotics at 1213 First Avenue, and that in fact the informant made such a purchase of 9.5 grams of crack cocaine on that day.

In preparation for the controlled buy, the Task Force had positioned several vehicles to conduct surveillance of Wharry's building, and the informant had been fitted with a wire transmitter that enabled Gabriele to hear and record conversations carried on inside the building. At approximately 1:15 p.m., the Task Force surveillance was in place. At approximately 1:46 p.m., over the informant's wire, Gabriele heard the telephone ring in Wharry's house and then heard Wharry announce that Hamilton was on his way to pick up a wallet. At approximately 1:53 p.m., members of the Task Force observed Hamilton drive into the surveillance area. Recognizing the surveillance—as he later indicated to Wharry—Hamilton did not stop at Wharry's house but instead drove past. Task Force members observed him drive around the surveillance area for several minutes. Wharry came out of the building and walked to the sidewalk; for the next ten minutes or so she walked up and down the street, walked up the stairs, came back down, and looked up and down the street. She finally reentered the building. Inside her apartment, she was heard complaining

that she had waited for Hamilton and that he had not shown up.

Hamilton then reached Wharry by telephone and persuaded her to meet him two blocks from the house. Task Force members had observed Hamilton making calls on his cell phone, and telephone company records for that telephone showed that between 1:46 p.m. and 2:02 p.m., Hamilton called Wharry's number six times. At least four of those calls were made after Hamilton first drove into the surveillance net.

At 2:07 p.m. Task Force members observed Wharry meet Hamilton and enter the back seat of his car. Hamilton then drove out of the surveillance area; at 2:10 he was observed driving back into the area. A minute later, Wharry was observed getting out of Hamilton's car, and one Task Force member testified that she ran back to her building "looking back," with a "fearful look on her face. She looked terrified." (Tr. 929.)

Wharry testified that when she went out to meet Hamilton, there was a police van parked in front of her house.

Q. How did you know it was a police van?

A. Because when I went down and met Hamilton, he said, you see that van, right. I was like, yes. He looked at me, sure, yes. He won't tell me exactly. . . .

(Tr. 1003.) Wharry described her meeting with Hamilton as follows:

Q. . . . . How is it that you happened to see Mike Hamilton on March 8, 2000?

A. He had called me, and I went down and met him two blocks down, and he saw me. He wanted to talk to me.

Q. Why did you meet him two blocks down?

A. You know, because he couldn't come in front of the house.

Q. Tell the jury what happened when you met Mike Hamilton that day?

A. I got in the car, and I ducked down because he said get down, and he did a U-turn, and *he asked me if I seen the van.* I say, yes. And he took me around. He asked me who was up in the house. He asked me if there was any drugs up there. I said no. He just kept going for a ride and talking to me.

Q. What else did he say to you?

A. You haven't been selling to nobody, right, you and Hodgy. He asked if me and Hodgy had been selling to anybody, and I said no. He said that the vice wanted me and Hodgy, to be careful.

. . . .

Q. Did he say anything else to you as he drove you around?

A. *He told me they were going to send somebody up with a wire.*

(Tr. 1003–05 (emphases added).)

When Wharry returned home from her meeting with Hamilton, Gabriele heard and recorded her conversation. On that tape, which was admitted over Hamilton's objection, Wharry tells those present that Hamilton has warned her that vice officers are after her and Hodgy, that they are sending someone up with a wire, and that Hamilton has told her to get out of the apartment (*see* GX 1–9.1T ("Hamilton, he's trying to keep me away from here, and I was like, you know, 'Drop me off back' (UNI [*i.e.*, unintelligible]) and acting like he knows. They're getting ready to come up in here.")).

Zwicker, one of those present in Wharry's apartment on March 8, testified, without objection, that Wharry, when she returned to the apartment after seeing Hamilton,

was upset, hysterically crying, just letting everybody know get out because

Hamilton told me something is going on. I don't know. She was like she thought that the house was going to get raided. She didn't know exactly what was going on, but something was going on.

Q. Had she just met with Hamilton?

A. Yes.

(Tr. 872.)

C. *The Verdicts and the Posttrial Motions*

The jury acquitted Hamilton of witness tampering and acquitted both defendants of violating RICO. It found Messere guilty of distributing and possessing with intent to distribute crack to Martinez on July 19, 1998; it found Hamilton guilty of aiding and abetting Wharry's maintenance of a crack house on March 8, 2000, and of using a cellular telephone on that date to facilitate her maintenance of the crack house.

Hamilton and Messere moved under Fed.R.Crim.P. 29 for judgments of acquittal on the ground that the evidence was insufficient to support their convictions. They moved alternatively under Fed. R.Crim.P. 33 for new trials on the principal grounds (a) that their convictions resulted from prejudicial spillover from the evidence on the RICO count on which they were acquitted, and (b) that their acquittals on the RICO count showed that the two defendants should have been tried separately. Messere also contended that the government had failed to disclose exculpatory evidence. In a Memorandum–Decision and Order dated April 1, 2002 ("District Court Opinion"), the district court denied both motions.

In denying the Rule 29 motion made by Hamilton, the district court stated that

[t]here was more than enough evidence in the record to prove that 1213 First Avenue in Schenectady was a place maintained for the distribution or use of

crack cocaine—*i.e.,* a "crack house." This evidence included the testimony of numerous witnesses, both law enforcement and drug users, that demonstrated unequivocally both that 1213 First Avenue was, during the period in question, a crack house and that Hamilton knew that 1213 First Avenue was a crack house.

In addition, there was sufficient evidence—both direct and circumstantial—to prove that Hamilton aided and abetted the maintenance of 1213 First Avenue as a crack house on March 8, 2000, by warning Wharry that her house was under surveillance by law enforcement, and that he used a cell phone in doing so. This evidence included the testimony of law enforcement witnesses . . ., the tape recording made by the informant inside 1213 First Avenue, the billing records for Hamilton's cell phone (which indicated that Hamilton called the crack house six times between 1:46 p.m. and 2:02 p.m. on March 8, 2000), and the testimony of Antoinette Zwicker. As such, the evidence at trial was sufficient to sustain Hamilton's convictions on Counts Three and Five.

District Court Opinion at 3.

In denying the Rule 29 motion of Messere, the court noted his contentions that the testimony of Martinez showed that Messere had not distributed drugs to her on or about July 19, 1998, as alleged in the indictment, and that the government had failed to prove that the substance allegedly distributed by Messere on July 19, 1998, was crack cocaine. The court stated that

[t]he jury could reasonably have found Messere guilty on Count Two based on the testimony introduced at trial. Martinez testified to receiving a substance from Messere that she picked up off the ground and determined it to be crack cocaine by smoking it. Siler testified that he was experienced with recognizing crack cocaine, and that he saw the substance Messere threw to Martinez on July 19, 1998, and that it appeared to be crack cocaine. The jury was free to accept or reject so much of the testimony as it saw fit, and it could reasonably have concluded that Siler, not Martinez, testified to the correct date of the distribution, and that the two witnesses were not, as Messere argues, referring to different events. In any event, Siler's testimony alone, if accepted by the jury, was sufficient to sustain the conviction on Count Two.

District Court Opinion at 4 (footnote omitted).

In denying defendants' motions under Rule 33 for a new trial, the district court concluded that there had been no prejudicial spillover of evidence from the RICO count, on which defendants were acquitted, to the counts on which they were convicted. The court noted that every alleged RICO predicate act was alleged to have been performed by one or both of these defendants, that the evidence on the RICO count involved many of the same or similar facts as that on the other counts, that the RICO evidence was no more inflammatory than the other evidence, and that even to the extent that the evidence on the RICO count differed from that on the counts of conviction, much of the RICO evidence would have been admissible under Fed. R.Evid. 404(b) to prove defendants' motive, intent, or knowledge with respect to the remaining counts. *See* District Court Opinion at 6–7.

The court also rejected the contention of Hamilton and Messere that they were entitled to new trials on the ground that they should have been tried separately. Given the relationship between the RICO count and the other counts, and given the sufficiency of the evidence on the counts of

conviction, the court concluded that defendants had not made the requisite showing of prejudice. *See id.* at 7 n. 2.

Finally, the district court rejected Messere's contention that the government had failed to disclose exculpatory evidence. It found that the testimony of the witnesses in question, though conflicting with the testimony of Siler, "simply cannot be fairly characterized as 'exculpatory'" and that the discrepancies were fully explored on cross-examination. *Id.* at 8. Further, the court found that both of the allegedly undisclosed witnesses had been identified to the defense.

Defendants were eventually sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, Hamilton and Messere contend principally that there was insufficient evidence to support their respective convictions. In addition, defendants pursue their contentions that they are entitled to new trials on the grounds that there was prejudicial spillover from the evidence on the RICO count; that they were prejudiced by being tried jointly, a joinder that they contend would have been improper in the absence of the RICO count; that the trial court erred in admitting tape recordings in evidence; and that the government failed to disclose exculpatory evidence and suborned perjury. Hamilton also contends that in calculating his sentence, see Part II.C. below, the district court misapplied the Sentencing Guidelines ("Guidelines"). We find no merit in any of defendants' contentions.

### A. *Sufficiency of the Evidence*

In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *See, e.g., United States v. Best,* 219 F.3d 192, 200 (2d Cir.2000), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001); *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000). In reviewing such a challenge, we must credit every inference that could have been drawn in the government's favor, *see, e.g., United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983), and affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *see, e.g., United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986). The "testimony of a single accomplice" is sufficient to sustain a conviction "so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Gordon,* 987 F.2d 902, 906 (2d Cir.1993). "[A]ny lack of corroboration goes only to the weight of the evidence, not to its sufficiency." *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *Id.*

"[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses," *United States v. Miller,* 116 F.3d 641, 676 (2d Cir.1997), *cert. denied,* 524 U.S. 905, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998); *see, e.g., United States v. Stratton,* 779 F.2d 820, 828 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983), "and to the jury's choice of the competing inferences that can be drawn from the evidence," *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998). The

same standards apply to the district court's consideration of an insufficiency argument in a motion under Fed.R.Crim.P. 29 for acquittal. *See, e.g., Autuori,* 212 F.3d at 114; *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999).

Applying these principles, we conclude that the sufficiency challenges of Hamilton and Messere must be rejected.

### 1. *Hamilton*

■■■ Under 18 U.S.C. § 2, a defendant may be convicted of aiding and abetting a given crime where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime. *See, e.g., United States v. Pipola,* 83 F.3d 556, 562 (2d Cir.), *cert. denied,* 519 U.S. 869, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990); *United States v. Wiley,* 846 F.2d 150, 154 (2d Cir.1988). Hamilton advances essentially four arguments in support of his contention that the evidence was insufficient to support his conviction of aiding and abetting the maintenance of a crack house (and, derivatively, his conviction for use of a cell phone to facilitate such maintenance). He contends (1) that the government failed to present evidence that he intended to assist a sale of narcotics at 1213 First Avenue on March 8, 2000 (*see, e.g.,* Hamilton brief on appeal at 14 ("The prosecution failed to call the buyer or the seller, or anyone else who may have had a proprietary interest in the deal or the crack-house on March 8, 2000.")); (2) that the drug sale at 1213 First Avenue on March 8 had been concluded before he conversed with Wharry, and a person cannot properly be convicted of aiding and abetting a crime that has "already [been]

completed" (*id.* at 22); (3) that there was no proof "that the substance involved was actually a narcotic" (*id.* at 20); and (4) that any inference that he sought to help maintain 1213 First Avenue as a crack house was "totally inconsistent" with testimony from Siler that Hamilton had submitted a "tip-sheet" to SPD's vice squad stating that 1213 First Avenue was a known drug location to be investigated (*id.* at 14). Hamilton's contentions provide no basis for reversal.

■■■ Hamilton's first two arguments misperceive the substance of Count Three of the indictment. That count did not charge Hamilton with aiding and abetting a sale of narcotics; rather it charged him with aiding and abetting the crime of "knowingly ... maintain[ing] any place for the purpose of ... distributing[ ] or using any controlled substance." 21 U.S.C. § 856(a)(1). An actual sale of narcotics at 1213 First Avenue on March 8, 2000, was not an element of that offense so long as the premises were being maintained on that date for any of the forbidden purposes. And although Hamilton correctly points out that a person cannot be found guilty of aiding and abetting a crime that already has been committed, *see, e.g., United States v. Freeman,* 498 F.2d 569, 575 (2d Cir.1974), the offense that Hamilton was alleged to have aided and abetted—maintenance of 1213 First Avenue as a crack house—was then ongoing; whether or not the sale made on that date had been completed when Hamilton spoke to Wharry was immaterial.

As to the elements of the § 856(a)(1) offense, there was, as the district court concluded in denying Hamilton's Rule 29 motion, *see* Part I.C. above, more than sufficient evidence that 1213 First Avenue was being maintained from late 1999 through March 8, 2000, for the purposes of distributing and using crack cocaine; and

as described in Part I.B. above, there was abundant evidence that Hamilton knew the nature of that use. Further, the testimony of Wharry and Zwicker, habitual crack users, was plainly adequate to permit the jury to find beyond a reasonable doubt that the substance distributed and used on those premises was crack cocaine.

Finally, the evidence was ample to permit the inference that Hamilton's actions on March 8, including the numerous calls on his cell phone to Wharry's apartment, were designed to warn Wharry that police surveillance vehicles were present, that the arrival of an informant wearing a wire was imminent, and that Wharry's engaging in any actual selling of drugs at that time would be perilous. Although Hamilton contends that there was evidence that was "totally inconsistent" with such an inference, the decision as to which of any conflicting accounts was to be credited was a matter for the jury. Given the evidence of Hamilton's past pattern of actions in aid of Wharry's operation of her residences as crack houses, the jury could easily infer that Hamilton's actions on March 8 were intended to help her to continue operating 1213 First Avenue as a crack house. We may not overturn that determination.

### 2. Messere

Messere argues that the evidence was insufficient to convict him of possession of crack with intent to distribute on or about July 19, 1998, because, although Siler testified that Messere threw crack cocaine from the police car for Martinez on that date, that testimony was not substantiated by Martinez or any other witness. Messere argues that his conviction should be reversed because the "witness accounts were entirely contradictory" and because the government "failed to establish that . . . the substance in question was cocaine

base." (Messere brief on appeal at 9.) We reject both contentions.

Siler's testimony provided evidence of all of the elements of the offense, including the nature of the substance thrown as crack cocaine. Any lack of corroboration for his testimony or any conflicting testimony was a matter to be argued to the jury, not a ground for reversal on appeal. We conclude that the evidence was sufficient for the reasons stated by the district court, see Part I.C. above, in denying Messere's Rule 29 motion.

### B. The Claims of Retroactive Misjoinder and Prejudicial Spillover

Hamilton and Messere contend that if their convictions are not reversed outright, they are entitled to new trials on the principal grounds that there was "retroactive misjoinder" in light of their acquittals on the RICO count of the indictment, that they suffered from prejudicial spillover of the evidence introduced on the RICO count, and that each defendant suffered from prejudicial spillover of the evidence that was introduced against the other. These contentions, which are intertwined, lack merit.

The term "retroactive misjoinder" refers to circumstances in which the "joinder of multiple counts was proper initially, but later developments—such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions—render the initial joinder improper." United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994); see, e.g., United States v. Vebeliunas, 76 F.3d 1283, 1293–94 (2d Cir.), cert. denied, 519 U.S. 950, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996); United States v. Novod, 927 F.2d 726, 728 (2d Cir.), cert. denied, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). In order to be entitled to a new trial on the ground of retro-

active misjoinder, a defendant "must show compelling prejudice." *Vebeliunas,* 76 F.3d at 1293; *Jones,* 16 F.3d at 493; *Novod,* 927 F.2d at 728. Such "compelling prejudice" may be found where there is "[p]rejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal." *Jones,* 16 F.3d at 493; *see generally Vebeliunas,* 76 F.3d at 1293; *Novod,* 927 F.2d at 728. The concept of prejudicial spillover—the only prejudice asserted by Hamilton and Messere to have resulted from the alleged retroactive misjoinder here—requires an assessment of the likelihood that the jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant. *See generally United States v. Tellier,* 83 F.3d 578, 582 (2d Cir.), *cert. denied,* 519 U.S. 955, 117 S.Ct. 373, 136 L.Ed.2d 262 (1996); *United States v. Barton,* 647 F.2d 224, 241 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981).

In *Jones,* the defendant was initially charged with armed bank robbery, bank robbery involving an assault, and use of a firearm during a crime of violence. His first trial resulted in a mistrial, with 10 jurors voting to acquit. The government then filed a superseding indictment, realleging those three counts and adding two new charges—counts four and five—of being a felon in possession of a firearm. Jones moved to have counts one, two, and three tried separately from counts four and five in order that the jury, when considering the first three counts, not learn and be influenced by the fact that he was a convicted felon. The district court severed count five but not count four, and at his second trial Jones was convicted on all four counts. This Court reversed the conviction on count four, however, because the government had failed to prove one element of that offense, to wit, that the firearm had traveled in interstate commerce.

*See* 16 F.3d at 492. Comparing the results of the two trials, we concluded that Jones was entitled to a new trial on the first three counts because the second jury had likely been influenced by the evidence— relevant only to the unproven count—that Jones was a convicted felon. *See id.* at 493.

In the wake of *Jones,* we have articulated a three-part test for determining whether there was likely prejudicial spillover from the evidence submitted in support of convictions that were set aside after trial. We consider (1) whether the evidence introduced in support of the vacated count "was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts;" (2) whether the dismissed count and the remaining counts were similar, and (3) whether the government's evidence on the remaining counts was weak or strong. *Vebeliunas,* 76 F.3d at 1294 (internal quotation marks omitted); *see United States v. Wapnick,* 60 F.3d 948, 953–54 (2d Cir. 1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996); *United States v. Rooney,* 37 F.3d 847, 855–56 (2d Cir.1994). The first prong of this test is not met where "the evidence that the government presented on the reversed counts was, as a general matter, no more inflammatory than the evidence that it presented on the remaining counts." *United States v. Morales,* 185 F.3d 74, 83 (2d Cir.1999), *cert. denied,* 529 U.S. 1010, 120 S.Ct. 1282, 146 L.Ed.2d 229 (2000). As to the second factor, *i.e.,* the degree of similarity between dismissed and surviving counts, prejudicial spillover is unlikely if the dismissed count and the remaining counts were either quite similar or quite dissimilar:

In cases where the vacated and remaining counts emanate from similar facts,

and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover.... By the same token, where the vacated and remaining counts arise out of completely distinct fact patterns, and the evidence as to both counts is readily separable, there is also no prejudicial spillover.

*Wapnick,* 60 F.3d at 954.

It is only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts, that spillover prejudice is likely to occur.

*Rooney,* 37 F.3d at 856 (emphasis in original).

We found such a prejudicial presentation in *Tellier,* 83 F.3d 578, in which Roy Tellier was convicted of committing a single robbery in violation of the Hobbs Act, 18 U.S.C. § 1951, and of violating RICO. The indictment charged him with only two predicate acts of racketeering activity; with respect to one of those acts, we concluded that the admissible evidence was legally insufficient. As the government thus had proven only one act of racketeering activity, we reversed the RICO conviction on the ground that the evidence was legally insufficient to establish the necessary "pattern" of racketeering activity. 83 F.3d at 581. Turning to the question of whether the RICO evidence might have affected the jury's consideration of the Hobbs Act count, we noted that "[a] RICO charge allows the government to introduce evidence of criminal activities in which a defendant did not participate to prove the enterprise element," *id.* at 582; that an "enormous amount," *id.* at 581, of evidence had been introduced "to prove the RICO 'enterprise' and its extensive criminal activities," *id.* at 582; and that all but a "tiny sliver of the evidence admitted on the RICO charges" was irrelevant to Tellier's alleged Hobbs Act robbery, *id.* We also observed that the government's brief on appeal contained a 43–page "description of the defendants' crimes," including "fifteen major robberies, four murders, one attempted murder, two sales of stolen drugs, and one bribery of a witness." *Id.* at 582. We concluded that Tellier was entitled to a new trial on the Hobbs Act count because prejudicial spillover was indisputable.

▮▮▮▮ In contrast, where the record indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each, we have found no basis for concluding that a new trial was warranted because of prejudicial spillover. The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others. *See, e.g., Morales,* 185 F.3d at 83 (no spillover between counts); *United States v. Friedman,* 854 F.2d 535, 564 (2d Cir.1988) (no spillover between counts), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *id.* at 563 (no spillover between defendants); *United States v. Casamento,* 887 F.2d 1141, 1153 (2d Cir.1989) (same), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *United States v. Orozco–Prada,* 732 F.2d 1076, 1086 (2d Cir.) (same), *cert. denied,* 469 U.S. 845, 105 S.Ct. 154, 155, 83 L.Ed.2d 92 (1984); *United States v. Carson,* 702 F.2d at 367 (same). Indeed, so far as we are aware, no case has held that a defendant was entitled, on the ground of retroactive misjoinder, to a new trial on the counts of conviction simply because the jury found the government's proof on other counts unpersuasive.

Although Hamilton and Messere contend that two of our cases have so held, citing *United States v. Ferguson*, 246 F.3d 129 (2d Cir.2001), and *United States v. Sam Goody, Inc.*, 675 F.2d 17 (2d Cir. 1982), their descriptions of those cases are entirely inaccurate. They describe *Ferguson* as "reversing convictions in light of spillover prejudice effect of acquitted RICO count evidence." (Hamilton brief on appeal at 34; Messere brief on appeal at 31.) But in *Ferguson*, the district court had granted a new trial, and we affirmed. Further, our affirmance was not on the ground advanced by Hamilton and Messere. The district court in *Ferguson*, after weighing the evidence, had concluded that the "evidence [was] unsatisfactory or insufficient to support the jury's finding of guilt beyond a reasonable doubt," *see* 246 F.3d at 137, and we ruled that the grant of a new trial for that reason was not an abuse of discretion. Although the district court had secondarily, *see id.*, expressed concern that there might have been prejudicial spillover from the evidence on counts on which the jury acquitted the defendant, we emphasized that the court had made the requisite analysis of the totality of the case. *See id.* at 136. And we stated that, because only the counts of conviction could be retried, any "[c]oncerns about prejudicial spillover ... are moot," and that the fact that there were acquittals "need not [be] discuss[ed]." *Id.* at 137.

Defendants misdescribe our decision in *Sam Goody* as "sustaining trial court's reversal of defendant's conviction 'in the interests of justice' ... due to 'distinct risk' that the jury had been improperly influenced by the allegations of the acquitted RICO count." (Messere brief on appeal at 31–32; *see* Hamilton brief on appeal at 34.) In fact, in that case the government had appealed the district court's grant of a new trial, and we dismissed the appeal for lack of appellate jurisdiction. *See* 675 F.2d at

20–25. Further, both the majority and concurring opinions in *Sam Goody* in fact saw little or no risk of prejudicial spillover, precisely because the jury had acquitted the defendant on some counts. *See, e.g., id.* at 26–27 n. 9 (majority opinion: "the likelihood that the jury's deliberations were tainted by the RICO allegation is far less than the likelihood found in [*United States v.*] *Guiliano*, [644 F.2d 85, 88–89 (2d Cir.1981) ], for here, unlike *Guiliano* [ in which convictions on certain counts were reversed on appeal for lack of sufficient evidence], the jury acquitted on the RICO count that was submitted to it"); *id.* at 29 (concurring opinion of Mansfield, J.: "Since the jury in the present case acquitted on the RICO count and the evidence on the other counts was the same, there could not have been any such prejudicial spillover."). In sum, neither *Ferguson* nor *Sam Goody* stands for the proposition that this Court has ordered a new trial on the ground of retroactive misjoinder or prejudicial spillover simply because a jury found some counts unproven.

 Even if the retroactive misjoinder concept were to be applied where there has been no ruling that evidence on any given count was legally insufficient but merely a judgment by the jury that the government's proof on that count was unpersuasive, Hamilton and Messere have not met the "compelling prejudice" test. The evidence on the RICO count here was surely no more inflammatory than the evidence on the counts of conviction, and the RICO count focused solely on the acts of Hamilton and Messere themselves rather than on the conduct of other persons. The government had no need here, as in *Tellier* for example, to introduce evidence as to "criminal activities in which [Hamilton or Messere] did not participate," 83 F.3d at 582, in order to establish the existence of a RICO enterprise. The alleged RICO en-

terprise in this case was the Schenectady Police Department, an entity that may properly be considered an enterprise within the meaning of RICO, *see, e.g., United States v. Grzywacz,* 603 F.2d 682, 685–87 (7th Cir.1979) (police department), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980); *United States v. Brown,* 555 F.2d 407, 415–16 (5th Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (police department); *United States v. Baker,* 617 F.2d 1060, 1061 (4th Cir.1980) (county sheriff's department); *see also United States v. Angelilli,* 660 F.2d 23, 31 (2d Cir.1981) (New York civil court system), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). No proof of the conduct of any person was needed to establish existence of the enterprise. Further, the indictment on which Hamilton and Messere were tried did not allege any predicate acts of racketeering activity by any person other than Hamilton or Messere.

Moreover, most of the conduct involved in the 12 RICO predicate acts would have been admissible at trial in the absence of a RICO count. Two of the predicate acts involved conduct identical to that alleged in Counts Two and Three of the indictment. Another predicate act involved distribution of drugs by Hamilton to Wharry, conduct that Wharry testified Hamilton had engaged in many times in assisting her to maintain her homes as crack houses by, *inter alia,* always responding to Wharry's calls, coming to remove drug dealers from her home, and leaving at least some of their drugs for her. Thus, evidence of the conduct charged in three RICO predicate acts clearly overlapped the evidence of conduct alleged in the counts of conviction.

In addition, much of the evidence on the other nine RICO predicate acts would, in the absence of a RICO count, have been admissible under Fed.R.Evid. 404(b). Six of the nine involved other instances in which Messere distributed controlled substances, proof of which would have been admissible to show a pattern of actions contrary to his suggestion that what he distributed on July 19 was not a controlled substance and to show his knowledge of the nature of the substance. In one of those six predicate acts, Hamilton was alleged to have participated with Messere in the distribution of narcotics to an informant, proof of which would likely have been admissible to show Hamilton's knowledge and intent with respect to narcotics use by his informants. And even if not admissible under Rule 404(b), proof of that one additional instance of narcotics distribution by Hamilton could hardly have been as startling as the evidence from Wharry and Zwicker of the repeated instances in which Hamilton helped Wharry maintain her crack house by, *inter alia,* responding to Wharry's calls and removing the drug dealers, but leaving behind a quantity of crack for Wharry "every time" (Tr. 987–88; *id.* at 986 ("I knew I was always going to get something")).

Finally, although the three remaining alleged predicate acts were not of the same genre, in that they involved witness tampering rather than drug distributions, the evidence presented in support of those allegations could not be said to have had any spillover effect on the jury, for on Count Four, on the only non-RICO count alleging witness tampering, the jury returned a verdict of not guilty.

In sum, we cannot conclude that the evidence introduced on the RICO count was substantially different from, or any more inflammatory than, the evidence introduced with respect to the counts on which defendants were convicted. As the government's evidence supporting the counts of conviction was ample, the district

court properly denied defendants' motions for new trials on grounds of retroactive misjoinder or prejudicial spillover.

### C. *Other Challenges to the Convictions*

Defendants also contend that they were entitled to a new trial because of errors in the admission of evidence and alleged derelictions of the government with respect to disclosures and veracity of evidence. We are unpersuaded.

### 1. *Objection to Tape Recordings*

 Hamilton and Messere contend that the district court erred in admitting in evidence the tape recording made by Gabriele of the March 8 conversations inside Wharry's house, as transmitted by the informant (who was known as "Supreme") and heard by Gabriele, as well as a tape recording of a conversation on April 11, 2000, between Supreme and one of Messere's informants, Seba Richards. Defendants argue that the tapes were not reliable because Supreme had supplied some of the participants in the conversations with drugs:

> The district court should properly have excluded these tape recordings, on the grounds raised by the defense—namely that they were the product of rambling, crack-intoxicated individuals who had been intentionally placed into that state by a Government informant seeking to obtain information for use by the Government.

(Hamilton brief on appeal at 60; Messere brief on appeal at 55; *see also id.* at 53 ("[T]he district court erred in admitting these tape recordings, obtained through Government agent 'Supreme' giving crack cocaine to Ms. Martinez and Ms. Richards as inducements to speak.").) In support of their contention, defendants cite cases from other circuits, *United States v. Starks,* 515 F.2d 112 (3d Cir.1975); *United*

States v. McMillan, 508 F.2d 101 (8th Cir.1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), which adopted a formal, seven-factor approach to the admission of audio recordings as enunciated in *United States v. McKeever,* 169 F.Supp. 426, 430 (S.D.N.Y.1958), *rev'd on other grounds,* 271 F.2d 669 (2d Cir.1959), including a requirement of proof that statements elicited were made "without any kind of inducement." *Starks,* 515 F.2d at 121 n. 11 (quoting *McKeever*); *McMillan,* 508 F.2d at 104 (same). This Court, however, has expressly and repeatedly declined to adopt the *McKeever* approach, refusing to "adopt[ ] a rigid standard for determining the admissibility of tape recordings." *United States v. Fuentes,* 563 F.2d 527, 532 (2d Cir.1977), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *see also United States v. Sliker,* 751 F.2d 477, 500 (2d Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 697 (1985). In *Fuentes,* we noted that "the varying circumstances of particular cases in which one or another aspect of this problem may present itself militate against our adoption of inflexible criteria applicable to all cases." 563 F.2d at 532. Instead, "we have adopted a general standard, namely, that the government 'produce clear and convincing evidence of authenticity and accuracy' as a foundation for the admission of such recordings." *Id.* (quoting *United States v. Knohl,* 379 F.2d 427, 440 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967)). We see no reason to adopt a more rigid standard in this case. A tape recording may be admitted in evidence when it has been properly authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a); *see, e.g., United States v. Tropeano,* 252 F.3d 653, 661 (2d Cir.2001); *United States v. Barone,* 913 F.2d 46, 49 (2d Cir.1990). Once a

relevant tape recording has been sufficiently authenticated, any question as to the veracity of the recorded statements and the credibility of the speakers goes to the evidence's weight rather than to its admissibility.

The recordings admitted in evidence in the present case were adequately authenticated, both by Gabriele, who heard the conversations and made the recordings, and by various parties to the conversations. Hamilton and Messere do not challenge the authenticity or accuracy of the recordings; rather they challenge the veracity and reliability of the statements that were recorded. These were matters for argument to the jury; they are not grounds for reversal on appeal.

### 2. Claims of Nondisclosure and Perjury

Defendants' additional contentions that the government failed to disclose exculpatory evidence and suborned perjury by Gabriele do not warrant extended discussion. We reject the nondisclosure contention because the items of evidence to which defendants point were either not exculpatory, or were not otherwise likely to impact a witness's credibility in such a way as to undermine a critical element of the government's case, *see, e.g., United States v. Wong*, 78 F.3d 73, 79 (2d Cir.1996), or were disclosed to defendants in a sufficiently timely manner. We reject the perjury contention because we see no basis in the record for a conclusion that Gabriele intentionally gave false testimony.

### D. Hamilton's Challenge to His Sentence

For a defendant convicted of aiding and abetting, "[t]he offense level is the same level as that for the underlying offense." Guidelines § 2X2.1. The guideline applicable to a defendant convicted of violating 21 U.S.C. § 856 is Guidelines § 2D1.8, which

"covers the offense of knowingly ... maintaining ... any building, room, or enclosure for the purpose of ... distributing[ ] ... or using a controlled substance contrary to law (*e.g.*, a 'crack house')." Guidelines § 2D1.8 *Background.*

Section 2D1.8, provides, in part, that such a defendant's offense level is "[t]he offense level from § 2D1.1 applicable to the underlying substantive offense." Guidelines § 2D1.8(a)(1). Section 2D1.1 links a defendant's base offense level to the quantity of narcotics involved in his relevant conduct. A defendant's relevant conduct includes

> (1)(A) all acts ... committed, aided, [or] abetted ... by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction ....

Guidelines § 1B1.3(a)(1).

In sentencing Hamilton under these sections, the district court found by a preponderance of the evidence that Hamilton "knew that 1213 First Avenue was a crack house in which numerous illegal crack cocaine transactions had occurred" (Sentencing Transcript, May 16, 2002 ("S.Tr."), at 13), and that when Hamilton talked to Wharry on March 8, 2000, and warned her about the police surveillance, he believed, based on his observation of the surveillance and "on the circumstances and his experience as a police officer, ... that a drug transaction was or was about to take place in the crack house" (S.Tr.13–14). The court found that Hamilton was accountable for the 9.5 grams of crack sold

to the confidential informant in the controlled buy on that date "because, based on his knowledge and experience as a police officer, the participants and the entire circumstances by a preponderance of the evidence the quantity of drugs was reasonably foreseeable by him." (S.Tr.14–15.) Based on that drug quantity, Hamilton's base offense level was 26; after a two-step upward adjustment under Guidelines § 3B1.3 for abuse of a public trust, his total offense level was 28. Given his criminal history category of I, the Guidelines-recommended range of imprisonment was 78–96 months. The district court departed downward from that range and sentenced Hamilton to a prison term of 54 months on Count Three, and a 48–month term on count Five, to be served concurrently.

Hamilton challenges his sentence, arguing principally (1) that the 9.5–gram quantity of crack sold on March 8 was not reasonably foreseeable to him, and (2) that under subsection (a)(2) of Guidelines § 2D1.8, which provides that

> [i]f the defendant had no participation in the underlying controlled substance offense other than allowing use of the premises, the offense level shall be 4 levels less than the offense level from § 2D1.1 applicable to the underlying substantive offense,

Guidelines § 2D1.8(a)(2), his total offense level should have been no more than 24. We reject both contentions.

■ In reviewing a sentence imposed under the Guidelines, we may not overturn the district court's findings of fact "unless they are clearly erroneous," and we must give "due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). We will not overturn the court's application of the Guidelines to the facts before it unless we conclude that there has been an abuse of discretion.

*See, e.g., United States v. Santiago,* 906 F.2d 867, 871 (2d Cir.1990).

■ We see no error, much less clear error, in the district court's findings that Hamilton knew that 1213 First Avenue was being used as a crack house, that he recognized that there was police surveillance of that house on March 8, and that he warned Wharry of that surveillance. Indeed, these facts were elements of or integral to the crack-house-maintenance offense that the jury permissibly found proven beyond a reasonable doubt. In addition, the court's finding that Hamilton, based on his police experience, believed that a controlled transaction was to take place and that a transaction of 9.5 grams of crack was reasonably foreseeable to him is not clearly erroneous. We see no abuse of discretion in the court's application to Hamilton of the base offense level set by Guidelines § 2D1.1 for the quantity of crack that was sold on the premises on one of the very days on which Hamilton was shown to be acting to protect Wharry's maintenance of the premises as a crack house.

■ Nor is there merit in Hamilton's contention that he was entitled to a four-step reduction in offense level under § 2D1.8(a)(2) on the ground that he had no participation in the underlying controlled substance offense other than allowing use of the premises. The commentary to § 2D1.8 states, *inter alia,* that

> subsection (a)(2) does not apply unless the defendant initially leased, rented, purchased, or otherwise acquired a possessory interest in the premises for a legitimate purpose.

Guidelines § 2D1.8 Application Note 1. Nothing in the record suggests that Hamilton leased, rented, purchased, or otherwise acquired a possessory interest in 1213 First Avenue at all, and at oral argument of this appeal his attorney confirmed to

this Court that Hamilton had no such ownership or proprietary interest. Accordingly, the subsection (a)(2) reduction was not available to Hamilton.

### CONCLUSION

We have considered all of defendants' arguments on these appeals and have found them to be without merit. The judgments are affirmed.